# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
November 19, 2003 Session

## STATE OF TENNESSEE v. JARRET A. GUY

**Appeal from the Criminal Court for Davidson County**
**No. 2001-B-896     J. Randall Wyatt, Judge**

---

### No. M2002-02473-CCA-R3-CD - Filed May 11, 2004

---

The defendant, Jarret A. Guy, was convicted of facilitation of first degree premeditated murder, felony murder, and robbery. The trial court merged the facilitation of premeditated first degree murder conviction into the conviction for felony murder and, after finding the existence of five aggravating circumstances, the jury imposed a sentence of life without the possibility of parole. The trial court imposed a concurrent sentence of fifteen years for the robbery conviction. In this appeal, the defendant asserts that (1) the evidence is insufficient to support his convictions; (2) the trial court included erroneous definitions of "knowing" and "intentional" in its instructions to the jury; (3) the trial court erred by severing his trial from that of his co-defendant, Jacob Edward Campbell;[1] (4) the sentence is excessive; and (5) the cumulative effect of the errors at trial require reversal. The judgments of the trial court are affirmed.

### Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA McGEE OGLE, JJ., joined.

John G. Oliva, Nashville, Tennessee, for the appellant, Jarret A. Guy.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; and Dan Hamm and Katrin Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1]Campbell was convicted of premeditated first degree murder, felony murder, and robbery and the trial court imposed an effective sentence of life plus ten years. This court affirmed the convictions and resulting sentences on direct appeal. See State v. Jacob Edward Campbell, No. M2003-00597-CCA-R3-CD (Tenn. Crim. App., at Nashville, Mar.15, 2004).

# OPINION

On July 18, 2000, Tony Roberts, who occasionally assisted the victim, eighty-two-year-old William Satterfield, by driving him to the grocery store and to doctor appointments, stopped to check on the victim and discovered that his car was gone. Although the victim did not drive, he had recently purchased a white, late-model Oldsmobile. A cushion had been left outside on the porch. Roberts waited on the porch and when the victim did not return within an hour, he asked some neighbors if they had seen the victim. After speaking with neighbors, Roberts felt that "there was something . . . very much out of place" so he called a friend of the victim and the two found the front door unlocked. According to Roberts, "the house was in total shambles." At that point, Roberts telephoned the police and provided them with a description of the victim's car.

Roberts testified that because the victim was distrustful of banks, he kept a large sum of cash at his residence. Roberts, who earlier had helped the victim prepare an inventory of his firearms, identified two shotguns and two handguns discovered after the arrest of the defendant and co-defendant. Roberts was also able identify the victim's "change tray," rings, and several pocket and wrist watches, all of which were found in a motel room where the defendant and co-defendant were staying.

Metro Police Officer Paul Sharp, who was first to arrive on the scene, found no signs of a forced entry but described the house as "ransacked." He noted that the phone line had been "ripped out." A man's shoe was in the living room and its mate was in the back bedroom. Two rolls of duct tape were on a bed in the back bedroom and a phone was lying under the bed. The wires had been removed. When Officer Kevin Allen arrived to assist, he and Officer Sharp went into the basement of the house but were unable locate anyone inside. At that point, he called a supervisor to request additional units to canvass the neighborhood and provided a description of the victim's car to the dispatcher.

Detective Jeff West and Officer Earl Hunter conducted a second search of the victim's residence and discovered the body in the basement underneath an "eggshell" mattress and other debris. Officer Hunter discovered that the victim's legs had been tied with telephone cord and taped together with duct tape. His hands had been tied behind his back with telephone cord and taped together with duct tape. Two plastic grocery bags had been placed over his head and sealed around the neck with duct tape. There was "wadding" in the victim's mouth, which had been sealed with duct tape, and there were ligature marks around the neck.

Murder Squad Police Detective E.J. Bernard identified the co-defendant when some of his relatives, who were acquainted with the victim, suspected his participation in the crime. Fearing that he might return to the neighborhood and harm them, the relatives informed police that a man named "Jarret or Jerry" was traveling with the co-defendant. Other than some cash and a handgun, all of the victim's property was recovered.

Metro Police Officer Grant Carroll, who had received information about the victim's vehicle, discovered a vehicle matching the description backed into a parking space of a Super 8 Motel in Goodlettsville. As he and another officer approached the car, the defendant, who had been sitting in the driver's seat, stepped out and walked toward them. The defendant was ordered to the ground and handcuffed. The officers discovered a key card to one of the rooms and found the co-defendant, the defendant's wife, and the defendant's infant daughter inside. Police found clothing, towels, and jewelry wrapped inside a blanket inside the motel room. Two handguns, one with a wooden handle and one with a pearl handle, were also recovered from the room. More jewelry was found on a table and on a night stand.

At trial, Nora Campbell, the co-defendant's sister, testified that her brother and the defendant, along with his wife and infant daughter, spent the night at her apartment the night before the victim's body was discovered. She recalled that the group was traveling in a white car, which the defendant claimed to have borrowed from his brother-in-law. Ms. Campbell testified that the defendant and co-defendant brought guns, prescription drugs, "[p]ocketwatches, . . . a wristwatch, and a ring" into her residence. According to Ms. Campbell, she refused their request to sell the prescription drugs for $3 per pill and asked them to leave the next day because she "felt like they had done something wrong." The defendant and his family left in the white car and Ms. Campbell drove her brother to the Super 8 Motel in Goodlettsville where the defendant and his family were staying. Ms. Campbell claimed that during their trip, the co-defendant admitted to her that they had "done something bad" and that when she asked whether they had killed someone, the co-defendant remained silent.

Charles McEwen, an acquaintance of the defendant, testified that the defendant asked to leave two shotguns at his house for a few hours. McEwen stated that he consented but asked the defendant to put the guns in his barn so that his grandchildren would not find them.

Angela Danielle Guy, the defendant's wife and a witness for the state, testified that on the day before the offense, she overheard the co-defendant tell the defendant that he knew "how they could make some money." According to Ms. Guy, the co-defendant claimed "that his grandfather's friend, . . . an old man, had a . . . large sum of money in his house. . . . [and] went grocery shopping . . . on Mondays." She recalled that on the following day, a Monday, the defendant and co-defendant left the Guy residence for approximately three to four hours and that upon their return, the defendant was driving the victim's white car. She stated that the defendant and co-defendant brought a number of stolen items into the residence. Later that evening, Ms. Guy and her infant daughter left the residence with the defendant and co-defendant and spent the night with Nora Campbell. Ms. Guy explained that they went to Ms. Campbell's residence "to get high" on "pills and crack" and upon leaving Ms. Campbell's residence, they checked into a room at the Goodlettsville Super 8 Motel, where they were found by the police. Ms. Guy identified a bassinet found in the trunk of the victim's car as belonging to her infant daughter. She testified that the police recovered several of the victim's belongings at her residence and recalled telling police that the victim's shotguns were at the McEwen residence.

In his initial interview with the police, the defendant claimed that the co-defendant arrived at his residence in the victim's car and told him that he had gone into the house of "a[n] old man that was good friends with his grandfather . . . and tied him up." He denied any participation in the crimes or driving the car. He claimed that the co-defendant had the stolen car, two shotguns, three handguns, and some cocaine. The defendant admitted being "a crackhead, thief" but claimed that it was not his "nature" to kill. After Detective Bernard informed the defendant that Ms. Guy was cooperating with the authorities, the defendant stated that the "[o]ld man should have shot . . . [the co-defendant]." The defendant then related that he and the co-defendant had gone to the victim's house and had visited on the porch for an hour when the co-defendant asked for a glass of water. After the co-defendant followed the victim inside, the defendant heard "scuffling" and saw that the co-defendant had tied the victim up and placed him face down on the bed. The defendant claimed that he then walked away from the residence and did not see the co-defendant until later, when he was driving the victim's car. He asserted that he did not know that the victim had been killed but admitted that the co-defendant gave him $750 and that they traded one of the victim's shotguns for drugs and sold another to McEwen for $30. The defendant contended that the co-defendant admitted placing duct tape over the victim's mouth and a plastic bag over the victim's head. The defendant insisted that he "never put [his] hands on the [victim]."

During a second interview, the defendant again insisted that he knew nothing of the co-defendant's plan and asserted that when he asked the co-defendant what was going on, the co-defendant responded, "[M]an, just don't worry about [it] -- just stay around." He claimed that he then walked down the street before returning to find that the victim's hands had been bound and the co-defendant was pointing a gun demanding to know the location of his cash. When the victim claimed that he spent all of his money on his car, the co-defendant took the wallet from the victim's pocket and forced the victim into a bedroom. According to the defendant, he agreed to watch the door but warned the co-defendant not to hurt the victim. The co-defendant placed the victim face down on the bed and bound his feet with a cord from the telephone. The defendant, who contended that he wanted to leave but was afraid that the co-defendant might shoot him, told police that the co-defendant filled a pillowcase with the victim's belongings and later placed a plastic bag over the victim's head, sealing it with duct tape before dragging him down the hallway. The defendant stated that he then left the victim's residence, walking to the co-defendant's grandmother's house where the co-defendant arrived a few minutes later in the victim's car. They drove to the defendant's residence, the co-defendant gave the defendant $740 dollars, and then they drove to north Nashville and sold two shot guns to McEwen for $30. Later, they returned to the defendant's residence, gathered their belongings, and drove to Ms. Campbell's residence.

Chief Medical Examiner Dr. Bruce Levy, who performed the autopsy, testified that the victim died during the afternoon hours of July 17, 2000, the day before police discovered the body. According to Dr. Levy, the cause of death was "a combination of manual strangulation and suffocation by a plastic bag." He testified that "[b]oth the manual strangulation or the plastic bag being placed over his head were, in and of themselves, . . . capable of causing [the victim's] death. . . . [B]oth of them played a role in his death in this case." The victim, who was five feet, five inches, in height, weighed only one hundred forty-three pounds. Markings on the victim's neck

indicated the "pressure of the fingertips of somebody's hands." The victim also suffered a large number of blunt force injuries to the back of his head, his face, and his forehead. The doctor noted that there was "a series of lacerations . . . on the right side of his face, in the cheek area, just in front of the ear and by the right eye." He also found a bruise "by the right shoulder, a scrape by the left shoulder, a bruise on the left side of the abdomen, and a series of bruises and . . . scrapes to the back area." Dr. Levy stated that he was unable to determine the cause of the blunt force injuries or whether the injuries were inflicted by more than one person. He did find defensive wounds to the arms and hands of the victim.

I

The defendant asserts that the evidence is insufficient to support the convictions. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

The defendant, originally charged with the premeditated murder of the victim, was convicted of the lesser included offense of facilitation of first degree premeditated murder. Tennessee Code Annotated section 39-11-403 describes facilitation of a felony as follows:

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Tenn. Code Ann. § 39-11-403(a). First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation means that the defendant acted with a "previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Thus, the evidence, in the light most favorable to the state, must establish beyond a reasonable doubt that the defendant knew that the co-defendant intended to kill the victim and that he furnished substantial assistance in the commission of that offense.

Here, the evidence established that the defendant and Campbell planned to rob the victim. They traveled together to the victim's residence and talked with him on the porch for some time. The defendant admitted that he saw Campbell bind the victim's hands and feet, place a plastic bag over his head, and seal the bag around his neck. He also admitted acting as a lookout for Campbell. The manner of the victim's death establishes that the act was one committed "after the exercise of reflection and judgment." See Tenn. Code Ann. §39-13-202(d). Under these circumstances, it is our view that the evidence is sufficient to support the conviction for facilitation of first degree murder.

The defendant also claims that the evidence is insufficient to support the convictions for felony murder and robbery. Felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1997 & Supp. 1999). Tennessee Code Annotated section 39-13-202 also provides that "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts." Tenn. Code Ann. § 39-13-202(b). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

Tennessee Code Annotated section 39-11-401 provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). In this case, a person is criminally responsible for the conduct of another if:

> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense; [or]
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(1)-(2).

The defendant claims that the evidence is insufficient to support the convictions because he had abandoned the plan to rob the victim. The evidence established that the co-defendant approached the defendant with a plan to acquire money while informing the defendant that the victim, who went to the grocery store each Monday, kept a large sum of money in his residence. The defendant and co-defendant left together on the day of the offenses, a Monday, and returned to the defendant's residence some three hours later. They were driving the victim's car and carrying his belongings. The defendant admitted to police that he saw the co-defendant bind the victim's hands and feet and ask where he hid his money. The defendant also conceded that he saw the co-defendant place a plastic bag over the victim's head and seal it with duct tape. Police officers testified that the victim's body was discovered in the basement of his residence covered by an eggshell mattress and

other debris. From this evidence the jury could have inferred that the defendant aided the co-defendant in the commission of the murder and robbery of the victim. While the defendant claimed to police that he left the victim's residence before the victim was killed or any property was taken, the jury was free to reject this claim. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). In our view, the evidence is sufficient to support the convictions for felony murder and robbery.

II

The defendant, citing State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), contends that the trial court erred by providing the nature-of-conduct definitions of "intentional" and "knowing" because the offenses for which he was convicted are result-of-conduct offenses. He argues that the error lessened the state's burden of proof. The state submits that because facilitation of premeditated murder, felony murder, and robbery are not strictly result-of-conduct offenses, there was no error.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999).

Here, the trial court provided the following instructions for the intentional and knowing mental states:

> A person acts "intentionally" when that person acts with a conscious objective either to cause a particular result or engage in particular conduct.
> A person acts "knowingly" with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

These same definitions were repeated throughout the instructions as to each offense.

In State v. Page, a panel of this court held that because second degree murder is a result-of-conduct offense, the trial court erred by including the nature-of-conduct and nature-of-circumstances[2] definitions of knowingly. Further, the panel determined that the error could not be classified as harmless beyond a reasonable doubt because the defendant's mental state was a contested issue at trial. 84 S.W.2d at 789-90. In other cases addressing this issue, this court has determined that error with regard to the definition of the culpable mental state may qualify as harmless beyond a reasonable doubt where *mens rea* is not a disputed issue at trial. See, e.g., State v. Theron Davis, No. W2002-00446-CCA-R3-CD (Tenn. Crim. App., at Jackson, May 28, 2003).

With regard to the defendant's convictions for felony murder and robbery, it is well-established that the required mental state for felony murder is the intent to commit the underlying felony. See Tenn. Code Ann. § 39-13-202(b); State v. Ely, 48 S.W.3d 710, 721 (Tenn. 2001). The underlying felony in this case was robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). This court has held that robbery is not strictly a result of conduct crime. See State v. Marcus Webb, No. W2002-00614-CCA-R3-CD (Tenn. Crim. App., at Jackson, Jan. 29, 2003). In Marcus Webb, the panel reasoned that "[t]he knowing *mens rea* of robbery refers to the 'knowing theft.' The knowing *mens rea* of theft refers to 'knowingly obtain[ing] or exercis[ing] control over the property.' The focus of the proscribed conduct is not upon its result." Id., slip op. at 5 (citations omitted).

Further examination of the robbery statute establishes that not only must the defendant knowingly obtain or exercise control over property to be guilty of theft, and thus robbery, he must also intend to deprive the owner of the property. See Tenn. Code Ann. § 39-14-103. Intent to deprive the owner of property would require knowledge that the defendant is not the owner of the property. In consequence, to be guilty of robbery, an accused must intend to engage in certain conduct, obtaining or exercising control over property; he must intend a certain result, the deprivation of the property; and he must be aware that certain circumstances exist, that he is not the owner of the property. Cf. State v. Hershel David Standridge, No. M202-01699-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Sept. 30, 2003) (holding that theft is not a result-of-conduct offense because the conduct is criminal due to the circumstances surrounding the taking of the property of another). In our view, each definition of both intentional and knowing would be relevant for the jury's consideration of this offense. Accordingly, the trial court did not err by providing the result-of-conduct and nature-of-conduct definitions of "intentional" and did not err by providing the result-of-conduct, nature-of-conduct, and nature-of-circumstances definitions of "knowing."

With regard to the conviction for facilitation of premeditated first degree murder, Tennessee Code Annotated section 39-11-403 provides that "a person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). Like

---

[2]"[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

robbery, this statute requires that the defendant know that certain circumstances exist, i.e., that another intends to commit a specific felony and engage in certain conduct, i.e., furnishing substantial assistance. In consequence, the jury needed more than a single definition of the term "knowing" to properly consider this offense as well. Thus, it is our view that the trial court did not err by providing those definitions.

III

The defendant next asserts that the trial court erred by granting the co-defendant's motion to sever. The state submits that severance was appropriate because the defendant and co-defendant had antagonistic defenses.

The co-defendant sought a severance because he wanted to introduce the defendant's confession to a similar offense that occurred five days before the one at issue in the trial. According to police, the defendant admitted breaking into the home of McDowell, an elderly man who lived alone in East Nashville. Once inside, the defendant bound McDowell's hands and feet with duct tape and cord from a telephone. After placing McDowell face down on his bed, the defendant stuffed a sock into his mouth and took his vehicle and other personal belongings. McDowell indicated that only one individual committed the crime and identified the defendant in a lineup as the perpetrator. The co-defendant asserted that this offense would be admissible to prove the identity of the defendant as the perpetrator because of the distinctive design implemented in its commission. See generally Tenn. R. Evid. 404(b). The co-defendant wanted to introduce the statement to show that the defendant killed the victim. He argued that admission of the statement in a joint trial would unfairly prejudice the defendant but the same would not be true in separate trials.

The trial court granted the severance, explaining that severance was necessary to protect the co-defendant's right to a fair trial. The trial court first determined that the defendant and co-defendant each sought to blame the other for the victim's murder, thus creating antagonistic defenses. The court observed that while the presence of antagonistic defenses alone would not be sufficient to warrant a severance, the potential admissibility of the defendant's confession to the robbery of McDowell created the possibility of undue prejudice to the co-defendant. Observing that if evidence of the McDowell offense were admitted in a joint trial" it would result in unnecessary prejudice to [the co-defendant]," the trial court also determined that a limiting instruction would confuse the jury rather than cure any prejudice. The trial court also noted that a severance would necessarily eliminate any potential Bruton[3] problems that might arise if the state sought admission of the defendant's statement in the instant case.

In this appeal, the defendant argues that he was unduly prejudiced by the severance because it permitted the state to introduce his videotaped statement concerning the robbery and murder of the victim. He does not argue that the statement was inadmissible but instead asserts that had there been a joint trial, the state would not have introduced it because of the ruling in Bruton v. United States, 391 U.S. 123 (1968). In that case, the trial court admitted evidence of the confession of a

---

[3]Bruton v. United States, 391 U.S. 123 (1968).

-9-

non-testifying defendant, notwithstanding the fact that the confession also inculpated Bruton, as to whom the statement was inadmissible hearsay. The trial court instructed the jury that the confession was admissible only as to the guilt or innocence of its maker. On appeal, the Supreme Court reversed the conviction, holding that such an instruction was not an acceptable substitute for Bruton's constitutional right of confrontation. Id. at 137.

The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent clear abuse of that discretion. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). Rule 14 of the Tennessee Rules of Criminal Procedure governs severance of defendants and provides in pertinent part as follows:

(2) The court, on motion of the State or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:
(I) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or
(ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn. R. Crim. P. 14(c)(2).

Here, the trial court found that severance was necessary to protect the co-defendant's right to a fair trial. This is a valid reason for severance. See Tenn. R. Crim. P. 14 (c)(2)(I). Further, while the state may not have introduced the defendant's videotaped statement had there been a joint trial, the record establishes that the state would have sought admission of the defendant's statement through the testimony of the officers who conducted the interview. Moreover, the defendant himself utilized the contents of the tape to minimize his role in the offenses. Accordingly, he has failed to show that the trial court abused its discretion by granting the co-defendant's motion for severance.

IV

The defendant asserts that the evidence does not support his sentence of life without parole. Specifically, he argues that because four of the five aggravating circumstances found by the jury are not supported by the evidence he is entitled to a new sentencing hearing. The state submits that the evidence is sufficient to support the finding of all five circumstances.

Initially, the defendant did not object to the imposition of any of the aggravating circumstances at trial and did not raise the issue in a motion for new trial. Ordinarily, the doctrine of waiver would apply. See Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived");

-10-

Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). This court is required, however, under Tennessee Code Annotated section 39-13-207, to review the appropriateness of a sentence of life without the possibility of parole. Tenn. Code Ann. § 39-13-207(g) ("When a defendant has been sentenced to imprisonment for life without possibility of parole, such defendant may appeal such sentence to the Tennessee court of criminal appeals. The court of criminal appeals shall first consider any errors assigned and then the court shall review the appropriateness of the sentence.").

When a defendant is convicted of first degree murder in a case in which the state is not seeking the death penalty, two sentencing options exist: life imprisonment and life imprisonment without the possibility of parole. Tenn. Code Ann. § 39-13-204 (1997). A life sentence is mandatory if, at the conclusion of the sentencing hearing, the jury concludes that the state has not proved any statutory aggravating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-(f)(1) (1997). If the jury determines that the state has proved one or more statutory aggravating circumstances, but concludes that the circumstances do not outweigh the mitigating circumstances beyond a reasonable doubt, a sentence of either life imprisonment or life imprisonment without the possibility of parole may be imposed. Tenn. Code Ann. § 39-13-204(f)(2) (1997). In determining which sentence to impose, the statute directs that the jury must "weigh and consider" the aggravating and mitigating circumstances but does not require the jury to determine that the aggravating circumstances outweigh the mitigating circumstances by any specific level of proof in order to impose a sentence of life imprisonment without the possibility of parole. Id.

In recognition of the substantial discretion afforded the jury in determining which sentence to impose, the statute governing appellate review declares that "[a] sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(I), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of . . . discretion." Tenn. Code Ann. § 39-13-207(g). Our supreme court has held that a misapplication of an aggravating circumstance in a life without parole case is not a constitutional violation because there is no death sentence. See State v. Harris, 989 S.W.2d 307, 317 (Tenn. 1999).

Although this case is not a capital case, the same aggravating circumstances necessary for the implementation of the death penalty must be considered. See State v. Stacy Dewayne Ramsey, No. 01C01-9412-CC-00408 (Tenn. Crim. App., at Nashville, May 19, 1998). Some aggravating circumstances address the nature and circumstances of the crime; others pertain to the particular conduct of the defendant in reference to the crime. See generally Tenn. Code Ann. § 39-13-204(I)(1)-(14).

Here, the trial court charged the jury with five aggravating circumstances that might be applied to determine the appropriate sentence:

(1) The defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person;

(2) the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;

(3) the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another;

(4) the murder was knowingly committed, solicited, directed or aided by the defendant while the defendant had a substantial role in committing or attempting to commit a robbery; and

(5) the victim of the murder was seventy years of age or older.

See Tenn. Code Ann. § 39-13-204(I)(2), (5)-(7), (14) (1997 & Supp. 1998). The jury was also charged with five potential mitigating circumstances:

(1) The defendant was an accomplice in the murder committed by another person and the defendant's participation was relatively minor;

(2) the death of the defendant's father and the effect it had on the defendant;

(3) the information about the defendant's daughter;

(4) the age of the defendant;

(5) any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant, which is supported by the evidence.

See Tenn. Code Ann. § 39-13-204(j)(5), (7), (9) (1997).

The defendant contends that the "prior violent felony" aggravating circumstance, see Tenn. Code Ann. 39-13-204(I)(2), was improperly applied because the only proof offered by the state were the certified copies of his convictions for aggravated assault. He argues that there was no proof that the aggravated assault convictions involved the use of violence. The state does not address the application of any of the aggravating circumstances individually but asserts that application of the circumstances was proper.

In State v. Sims, our supreme court held that "[i]n determining whether the statutory elements of a prior felony conviction involve the use of violence against the person for purposes of § 39-13-204(I)(2), . . . the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements of that felony may be satisfied either with or without proof of violence." 45 S.W.3d 1, 11-12 (Tenn. 2001). Our high court concluded that the statutory elements of aggravated assault may be satisfied without the proof of violence to the person. Recently, in State v. Powers, our supreme court affirmed the procedure outlined in Sims:

-12-

In Sims, the State introduced evidence of two prior convictions for aggravated assault to establish the prior violent felony circumstance. We recognized that the statutory elements of aggravated assault do not necessarily involve the use of violence. Accordingly, we approved a procedure in which the trial judge, outside the presence of the jury, considers the underlying facts of the prior assaults to determine whether the elements of those offenses involved the use of violence to the person. If the trial court determines that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence that the defendant had previously been convicted of the prior offenses. The trial court then would instruct the jury that those convictions involved the use of violence to the person.

101 S.W.3d 383, 400-01 (Tenn. 2003).

Here, the state introduced proof in the form of certified copies of the judgments of conviction that the defendant had been twice convicted of aggravated assault. There was no proof that either assault involved the use of violence to the person. As our high court has recognized, aggravated assault may be committed without violence to the person. See id. There is no indication that the trial court followed the procedure established in Sims to determine whether the defendant's prior convictions involved violence to the person. In consequence, this circumstance should not have been submitted to the jury. Moreover, because there was no evidence that the assaults involved violence to the person, this circumstance should not have been applied. For reasons set forth more fully below, however, it is our view that the misapplication of this circumstance does not entitle the defendant to a new sentencing hearing.

The defendant also asserts that the "felony murder" aggravating circumstance, see Tenn. Code Ann. § 39-13-204(I)(7), should not have been applied because the evidence is insufficient to support a finding that the victim was murdered during the commission of a robbery and because the trial court gave an erroneous definition of knowing in relation to the offense. As previously indicated, these issues are without merit. Accordingly, this circumstance was properly applied.

Next, the defendant contends that aggravating circumstance (I)(5), that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, should not have been vicariously applied to him for injuries inflicted upon the victim by the co-defendant. He does not dispute that the injuries inflicted upon the victim were sufficient to support the application of this circumstance. Instead he contends that because there was no proof that he actually inflicted the injuries, the circumstance was improperly applied.

To determine whether an aggravating circumstance based upon the of the actions of the co-defendant might be vicariously applied to the defendant, this court must consider, under the guidelines of Tison v. Arizona, 481 U.S. 137, 158 (1987), whether the defendant's degree of participation was "major" and whether he displayed "reckless indifference to human life." If so, a particular aggravating circumstance may be applied. Whether a statutory aggravating circumstance might vicariously apply also depends upon the specific language of the statute. State v. Johnson, 38

-13-

S.W.3d 52, 63 (Tenn. 2001) ("Unlike other aggravating circumstances, . . . the statutory language of the (I)(3) aggravating circumstance simply does not permit application of this aggravating circumstance unless the defendant 'knowingly created' the 'great risk of death,' either by his or her own actions or by directing, aiding, or soliciting another to do the act . . . that creates the great risk of death.").

In our view, the defendant's degree of participation in the robbery and murder of the victim was "major" and the defendant's actions displayed "reckless indifference to human life." See Tison, 481 U.S. at 158. The defendant actively participated in the planning of the robbery and admitted acting as a lookout while the co-defendant bound the victim and threatened him with a gun. The defendant also acknowledged that he looked on as the co-defendant placed a plastic bag over the victim's head and sealed it with duct tape. Further, he profited from the illegal acts and it was his idea to take the victim's shotguns to McEwen. Because the defendant was a major participant in the crimes against the victim, any aggravating circumstance whose statutory elements permit vicarious application could be applied to him on the basis of the co-defendant's actions.

In Owens v. State, this court ruled that the "especially heinous, atrocious, or cruel" aggravating circumstance is vicariously applicable to a defendant who did not actually kill the victim. 13 S.W.3d 742, 763 (Tenn. Crim. App. 1999) This court observed that "the vicarious application of an aggravating circumstance, where statutorily permissible, does not trespass upon the mandates of either the Eighth Amendment of the United States Constitution or Article 1, Section 16 of the Tennessee Constitution." Id. at 760. This court further observed as follows:

> The plain language of this provision, "read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning, clearly focuses on the murder itself and not the defendant's own actions or intent. After examination of this issue, we conclude that it was the legislature's intent that the (I)(5) aggravator impute liability upon a defendant for conduct for which he or she is criminally responsible. This aggravator, by its plain language, clearly encompasses consideration of the nature and circumstances of the crime itself, which would permit such a vicarious application. The emphasis in the (I)(5) aggravator is on the manner of killing, not on the defendant's actual participation.

Id. at 763 (citations omitted). The injuries inflicted on the victim as well as the manner of his death were sufficient to support the application of this circumstance. Further, although the defendant claimed to police that he asked the co-defendant not to hurt the victim, the jury was free to reject this claim. In consequence, the trial court properly instructed the jury that this aggravating circumstance could be considered in the determination of the sentence.

The defendant also contests the application of aggravating circumstance (I)(6), that the murder was committed to avoid, interfere with, or prevent a lawful arrest or prosecution. He does not contend that avoiding arrest or prosecution was not one of the co-defendant's motives for killing the victim but argues that the state failed to prove that he had such a motive. Initially, while the

-14-

(I)(6) circumstance focuses on the intent of the killer, the plain language of this statute recognizes that one other than the killer may profit from that intent: "The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13- 204(I)(6) (emphasis added). This court has previously determined that this aggravating circumstance is applicable when avoiding arrest or prosecution is a motive for the murder, regardless of the conduct of a particular defendant, so long as that defendant was a "major" participant in the crime. See State v. Howell, 34 S.W.3d 484 (Tenn. 2000). Finally, it is not necessary that the state prove that the desire to avoid arrest or prosecution be the only motive for the killing, only that it was a motive. See State v. Hartman, 42 S.W.2d 44, 58 (Tenn. 2001).

As indicated, the defendant was a major participant in the crimes against the victim and his conduct showed a reckless indifference to human life. See Tison, 481 U.S. at 158. Further, the proof established that the victim knew the co-defendant and was friends with the co-defendant's grandparents. The defendant's statement also indicates that the co-defendant was, at least in part, motivated by a desire to prevent the victim from identifying him as the perpetrator. Accordingly, it is our view that the trial court properly instructed the jury on this aggravating circumstance.

In summary, the trial court properly instructed the jury on and the evidence was sufficient to support a finding of four aggravating circumstances:

> (1) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;
> (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;
> (3) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing a robbery; and
> (4) the victim of the murder was seventy years of age or older.

See Tenn. Code Ann. § 39-13-204(I)(5)-(7), (14) (1997 & Supp. 1999). Under the circumstances presented here, the "prior violent felony" aggravating circumstance should not have been submitted to the jury. Because the record supports a finding of four aggravating circumstances, and only one is necessary for the imposition of a sentence of life without parole, the defendant is not entitled to relief on this issue.

V

Finally, the defendant asserts that the cumulative effect of the errors at trial denied him the right to a fair trial. Because we discern no error in the conduct of the trial and only a harmless error in the sentencing phase, the misapplication of the "prior violent felony" aggravating circumstance, the defendant is not entitled to relief on the basis of cumulative error.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE