IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 3, 2014

## STATE OF TENNESSEE v. MICHAEL KIZER

**Appeal from the Criminal Court for Shelby County**
**No. 10-08128     James C. Beasley, Jr., Judge**

_____

**No. W2013-02559-CCA-R3-CD  -  Filed November 3, 2014**

_____

Michael Kizer ("the Defendant") was convicted by a jury of two counts of aggravated robbery and one count of attempted aggravated robbery. Following a sentencing hearing, the Defendant received a total effective sentence of forty-five years' incarceration. In this direct appeal, the Defendant contends that the trial court improperly severed his case from that of his co-defendant and that the trial court erred in allowing the State to reopen its proof in order to introduce the testimony of his co-defendant. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Michael Kizer.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Vicki Carricker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A Shelby County grand jury indicted the Defendant on two counts of aggravated robbery and one count of attempted aggravated robbery. See Tenn. Code Ann. § 39-12-101 (2006); 39-13-402 (2006). Prior to trial, the Defendant moved for severance of his case from that of his co-defendant, Martrevious Kizer,[1] on the ground that Martrevious had filed a notice of intent to pursue a defense of duress. During a pretrial hearing on the motion, the Defendant argued that severance was warranted because Martrevious's defense of duress was antagonistic to his own defense. In denying the motion, the trial court reasoned, "I don't think that just the mere fact of antagonistic defenses is sufficient . . . under the circumstances I don't see a valid reason why just simply one of them saying the other made me do it is sufficient grounds for me to sever." The Defendant proceeded to a jury trial on April 30, 2013.

Officer Thomas Avery with the Memphis Police Department ("MPD") testified that, on June 27, 2010, he responded to a call of a robbery on Monsarrat Street in Memphis. When he arrived at the scene, he encountered three victims: Kristen Hall, Frederick Green, and Marquette Sidney. He described the scene he encountered upon arrival as "frantic." Green had a bleeding wound on the side of his face, and Sidney had a "noticeable contusion or laceration" on the back of his head that was "bleeding relatively profusely." Officer Avery also noticed that Kristen Hall was "in her underwear" and that Green was "missing his shoes." After he arrived on the scene, another victim, Farrah Hall,[2] came out of a "vacant lot in the woods" and appeared nervous. Officer Avery called an ambulance for Sidney and Green. He took a short statement from Green before Green was taken to the hospital for treatment of his head wound. Officer Avery also took a statement from Kristen Hall.

Farrah Hall testified that she was fourteen years old at the time of the robbery. Kristen Hall is her sister. In the early morning hours of June 27, 2010, Farrah was walking down Monsarrat Street with Kristen, Green, and Sidney. Farrah testified that they were walking "in the street," rather than on the sidewalk. As they walked, a white, four-door car carrying three people pulled up next to them. Someone in the white car asked them if they knew a person named Markisha. As Farrah and Kristen began to walk towards the car, "[the

---

[1] Because he and the Defendant share the same surname, we will refer to Martrevious Kizer by his given name to avoid any confusion. We intend no disrespect.

[2] Because Kristen Hall and Farrah Hall share the same surname, we will refer to them by their given names. We intend no disrespect.

Defendant] jumped out of the car." Farrah identified the Defendant and testified that she recognized the Defendant because she had "seen him around." The Defendant was riding in the front passenger seat of the car.

After he exited the car, the Defendant "told [Kristen] and them to take off all their clothes." The Defendant had a "black pistol" in his hand and he was "holding it towards [Green's] head" as he demanded that the victims strip their clothes. Farrah ran "far into the bushes" in a nearby vacant lot, where she hid and called the police. While she was in the bushes, Farrah heard the Defendant tell Kristen to "strip her clothes." The Defendant stated that he was "going to rape [Sidney] and Kristen." The Defendant took a pack of cigarettes from Kristen. He also took Green's shoes. At some point during the robbery, Farrah saw Martrevious exit the car through the driver's side rear door. She recognized Martrevious from "seeing him around the neighborhood." Farrah testified, "I saw [the Defendant] drop the gun, and I seen [Martrevious] get out and pick it up."

On cross-examination, Farrah clarified that the Defendant was the person who had asked about Markisha from the white car. She agreed that the Defendant was not wearing a hood or a mask. She also agreed that the street was lit and that there were houses on both sides of the street. Farrah testified that the police showed up about five minutes after she called them.

Kristen Hall testified that, on the night of the robbery, she was walking on Monsarrat Street with Farrah, Green, and Sidney. The four of them lived in the neighborhood and they were walking to the store. As they walked, "a mysterious vehicle pulled up" beside them. The windows were down, and the person in the front passenger seat, whom she identified as the Defendant, asked them if they knew "Keisha." Kristen responded that she had not seen Keisha. At that point, the Defendant "jumped out" of the car and said, "Give me every mother f***ing thing ya'll got." Kristen testified that she immediately recognized the person to be the Defendant[3] because he had a distinctive "tattoo on the middle of his forehead." When the Defendant jumped out of the car, Kristen noticed that he was wielding a black handgun. Kristen looked for Farrah, and she saw that Farrah had run away toward the bushes.

The Defendant was "waving the gun" and told them to "strip naked." The Defendant asked them, "[Y]a'll think I'm playing?" Next, the Defendant "cocked the pistol and proceeded to pistol whip [Sidney]." Kristen clarified that by "pistol whip" she meant that the Defendant struck Sidney in the head with the gun. After the Defendant hit Sidney, Kristen realized that the Defendant was "serious," so she "proceeded to undress." She

---

[3] Kristen stated that she knew the Defendant by his nickname, "Twin Loke."

testified, "I was in my bra and panties in the middle of the street crying." The Defendant went through Sidney's pockets as Sidney was "laying on the ground helpless." At one point during the robbery, the Defendant dropped the gun. Kristen saw the passenger in the back seat of the car get out and pick up the gun. She recognized that person as Martrevious, because she went to school with him, and they had "hung out together." Martrevious picked up the gun and "walked toward [Green] where he then proceeded to pistol whip [Green]." Kristen testified that the Defendant was the one doing most of the talking. At some point during the robbery, the Defendant said, "I ought to rape you" to Sidney. The Defendant then turned to her and stated, "I'll rape you too." Kristen saw the Defendant take some cash and a pack of cigarettes from Sidney's pockets. She also saw Martrevious take Green's shoes. Eventually, the police arrived and Kristen gave them a statement.

On cross-examination, Kristen confirmed that she recognized the Defendant when he got out of the car "with no dispute about it." Kristen estimated that the entire robbery lasted about ten minutes. She clarified that, when the Defendant dropped the gun, it slid toward the car so that it was partially underneath the car when Martrevious picked it up. Kristen confirmed that Green's cell phone was taken. Kristen agreed that the Defendant could be characterized as "the mastermind" of the robbery.

Frederick Green testified that he also was a victim of the robbery on Monsarrat Street. He described the car that the Defendant pulled up in as "a white car" with "no license plate." The Defendant exited the front passenger side of the car and "came over the hood" around the front of the car. As he came toward them, the Defendant was moving at "a quick pace." The Defendant pointed a black handgun at Green. According to Green, the Defendant commanded them to "give it up." Green testified that he could not remember many details from the event because he was in a state of shock and "couldn't believe what was happening." He did not recognize the Defendant on the night of the robbery. Green recalled that the Defendant first hit Sidney with the gun. After he hit Sidney, the Defendant "pistol whipped" Green "in the face." At some point during the robbery, Martrevious exited the rear driver's side of the vehicle. Green's shoes, his cell phone, and some cash were taken from him, although he could not recall who took which item. Green estimated that the total value of all the items stolen from him was around two hundred dollars. Eventually, the Defendant and Martrevious left in the white car, and the police arrived shortly thereafter. Green made a statement to police on the scene, and his wound was examined by paramedics. Green ultimately declined hospital treatment.

On cross-examination, Green testified that he did not recall ever having seen the Defendant drop the gun on the ground, nor did he recall seeing someone pick the gun up.

Marquette Sidney testified that he was also a victim of the robbery on Monsarrat Street. He identified the area of the robbery on a map and testified that he had grown up in the neighborhood where the robbery occurred. As he walked with Farrah, Kristen, and Green, "a white car just pulled up from behind." The Defendant "jumped out" of the front passenger seat with a gun in his hand and shouted, "Give me every f***ing thing you have." The Defendant pointed the gun at Sidney's head from "a couple of feet" away. Sidney testified that his "mind was blank," and he did not react immediately. He testified, "I didn't react fast enough so [the Defendant] went to pistol whipping me." The Defendant struck him "about twenty times" with the gun "all over [his] head." As a result, Sidney sustained wounds to his head and had to be treated in the hospital.

Sidney recalled that the Defendant had a tattoo of an "H" on his forehead. While the Defendant was striking Sidney, the Defendant searched Sidney's pockets and took "[t]wo dollars and a pack of cigarettes." At one point during the robbery, the Defendant dropped his gun. Sidney tried to reach for the gun, but Martrevious pointed a second gun at him and told him to leave the Defendant's gun on the ground. Sidney noticed that Kristen and Green were undressed. He recalled that the Defendant demanded that everybody "get naked." Sidney testified that, as a result of his head wounds, he was "bleeding everywhere." Shortly after the Defendant fled the scene, paramedics arrived, and Sidney was taken to the hospital for treatment of his head wounds. Sidney identified a photograph of himself taken in the hospital shortly after the robbery. He identified another photograph of the gash on the back of his head taken the day following the robbery. His head wound required ten stitches.

On cross-examination, Sidney testified that he never heard anybody in the car ask them if they knew somebody named Keisha. He recalled that the Defendant pointed the gun at all four of them. He testified that the gun was black, and he believed that it was a Glock. He stated that, although the Defendant struck him repeatedly, the Defendant never knocked him down. When the Defendant dropped the gun to the ground, both he and the Defendant tried to pick it up at the same time, however, "the second gun came up to [his] head and [Martrevious] told [him to] put the gun down," so he "left the gun alone." After reading the statement he made to police, Sidney recalled that he told police officers that one of the guns was .45 caliber and that the other gun was a .380 caliber. However, he could not remember the caliber of the guns at the time of trial. He testified that he had consumed about two beers on the night of the robbery.

After the State rested its case-in-chief, both the Defendant and Martrevious moved for a judgment of acquittal, and the trial court denied the motions. The Defendant notified the trial court that he intended to testify on his own behalf. The record reveals that the Defendant recently had been released on numerous felony convictions, including multiple convictions for aggravated assault, aggravated robbery, and theft of property. The State

made a motion for the trial court to allow these prior convictions to be introduced on cross-examination of the Defendant for impeachment purposes. Martrevious joined the State's motion. Martrevious asserted that the prior convictions were relevant to his defense of duress, arguing, "[Martrevious's] testimony is going to be that [the Defendant] is dangerous, [Martrevious] knew that because [the Defendant had] been in the penitentiary for dangerous convictions", and, therefore, the prior convictions should be introduced "to show that Martrevious would feel duress in the situation that he's in."

The trial court ruled that the Defendant's theft convictions were admissible as they were highly probative of the Defendant's credibility and outweighed any prejudice to the Defendant. However, the trial court declined to admit the Defendant's prior convictions for aggravated robbery and aggravated assault, reasoning that the similarity of those convictions to the crimes alleged in the instant case carried a high risk of unfair prejudice. Martrevious again asserted that the prior aggravated robbery and aggravated assault convictions were material to his defense of duress. In response, the trial court reasoned that to preclude Martrevious from introducing the relevant convictions would "imped[e] his ability to put on his defense." The trial court stated that, unless the State had "something further" to add, the trial court was "inclined to grant" the Defendant's original motion to sever and to go forward with the Defendant's trial alone.

At that point, there was a recess after which it was announced that Martrevious had reached a plea agreement with the State. The trial court thereafter accepted and entered Martrevious's guilty plea. The trial court allowed the State to reopen its case-in-chief in order to introduce the testimony of Martrevious. At that time, the Defendant objected to allowing the State to reopen its case-in-chief, and the trial court overruled the objection. In overruling the objection, the trial court reasoned, "[T]he Defense hasn't actually begun to put on proof. I think based upon the change in circumstances it would be proper for me to allow the State to reopen its case, so I don't see any prejudice to the Defendant at this point, so I'm going to allow it." Thereafter, the trial court gave a jury instruction explaining that the jury should not consider the fact that the State had been allowed to reopen its case-in-chief for any reason.

Martrevious Kizer testified that he knew Kristen from "[a]round the neighborhood" and that he had attended school with Farrah. He identified the Defendant as his uncle. Shortly before the robbery, Martrevious called the Defendant and asked him for a ride to his grandmother's house. The Defendant picked him up in a white, four-door car. When the Defendant arrived, there was another person in the car, although Martrevious could not identify him. Martrevious sat in the back seat, the Defendant sat in the front passenger seat, and the unidentified person was driving. The Defendant and the unidentified person told Martrevious that they would drop him off after they rode around for a while. They drove

around for about thirty minutes, until they spotted a group of people walking on Monsarrat Street. At that point, the Defendant asked Martrevious if he was "with them." The Defendant cocked his gun, and they pulled the car up next to the pedestrians. Martrevious described the gun as a black handgun. The driver told Martrevious to "watch [the Defendant's] back." Martrevious saw the Defendant exit the car, walk up to the pedestrians, and strike one of the men with the gun. He did not recall hearing the Defendant say anything to the people. At some point during the robbery, Martrevious testified, "The gun hit the ground, I was in the back seat and I heard [the Defendant] saying get my sh**, get my sh**." Martrevious "hopped out the car and gave [the Defendant] the gun back." He admitted that he "[p]atted [Green's] pocket" but testified that he did not take anything out of it. After the robbery, the Defendant and the unidentified driver dropped Martrevious off at his grandmother's house. Martrevious recalled that "two dollars and some cigarettes" were among the things taken from the victims, but he could not remember if there were any shoes taken.

On cross-examination, Martrevious testified that he only saw three people walking on Monsarrat Street, two males and one female. Martrevious did not see the Defendant with a gun while they were riding in the car. He saw the gun for the first time in the Defendant's hand immediately after the Defendant exited the car. Martrevious admitted that he could have fled as soon as he saw the Defendant pull out the gun, but he did not. From where he was sitting in the car, Martrevious could not hear anything that the Defendant said to the victims. He agreed that he pleaded guilty to a reduced charge in accordance with his plea agreement with the State. On redirect examination, Martrevious clarified that the he first saw the Defendant with a gun when the Defendant turned around in the car and told Martrevious to "watch his back." At the conclusion of this testimony, the State again rested its case-in-chief.

The Defendant testified that, on the night in question, he got off work around midnight. Shortly thereafter, the Defendant asked a friend to give him a ride to the store. As he left the store, Martrevious approached him and appeared to be crying. Martrevious "said he had been jumped by two guys over at a girl's house." The Defendant asked Martrevious to lead him to the men who had jumped him. They were driving a "white four-door Intrepid." The Defendant sat on the passenger side, his friend drove, and Martrevious sat in the back. When they saw the victims walking on Monsarrat Street, Martrevious said, "that's them walking," and they pulled over. The Defendant asked Martrevious to point out the men who had attacked him earlier, and Martrevious pointed out Green. At that point, the Defendant testified, "I jumped out of the car, me and the driver, and Martrevious, and I hit [Green]." According to the Defendant, he never had a gun. The Defendant stated, "I hit [Green] in the face and I hit him so hard I dislocated a bone in my right hand." The Defendant testified that, while he was busy fighting with Green, Martrevious and the driver

were fighting with Sidney. The Defendant recalled that, as the fighting was going on, Kristen "was standing there . . . hollering and saying stop." The Defendant denied having ever commanded Kristen to take her clothes off. According to the Defendant, "We ain't take nobody's clothes off. We didn't make nobody take no clothes off." The Defendant also denied that he took anything from the victims. He testified, "It was a fight. It wasn't no robbery."

On cross-examination, when asked whether he had a tattoo of an "H" on his forehead, the Defendant responded, "Everybody knows in South Memphis I got the tattoo." He denied ever telling the victims to "give it up" and again denied taking any of their possessions. Following the Defendant's testimony, the defense rested its proof. The jury deliberated and found the Defendant guilty as charged. The trial court later sentenced the Defendant to thirty years on each of his two aggravated robbery convictions and ordered that those sentences run concurrently. The trial court also sentenced the Defendant to fifteen years on his attempted aggravated robbery conviction and ordered that the sentence run consecutively to the Defendant's aggravated robbery conviction, for a total effective sentence of forty-five years' incarceration. The Defendant filed a motion for new trial, which the trial court denied. The Defendant then filed a timely notice of appeal.

## Analysis

In this direct appeal, the Defendant alleges that the trial court erred "in allowing the state to reopen the case [and] allowing [Martrevious] to testify against [the Defendant]." In support of this assertion, the Defendant argues that he "was denied the right to pick a fair and impartial jury." Specifically, he argues, "If the [Defendant] was aware that a severance would be granted during the middle of the trial, prior to the jury selection process, obviously [the Defendant] would have questioned each juror as to whether or not such severance in the middle of trial would affect their verdict." Furthermore, the Defendant argues that "it was unnecessary for the court to declare a severance." In support of that assertion, the Defendant argues that, because "[f]our witnesses testified for the State," Martrevious's testimony "could add nothing to the State's case." Therefore, the "prejudicial effect" of his not being able to question the jury about the potential effect of a severance "far outweighed any probative value that such severance might have."

A trial court has "wide discretion in determining whether or not to grant permission to reopen the case by either the State or the Defendant." State v. Tuttle, 914 S.W.2d 926, 931 (Tenn. Crim. App. 1995) (citing Oliver v. State, 208 Tenn. 692, 697 (Tenn. 1961)); see also State v. Patrick Brown, No.W2008-00108-CCA-R3-CD, 2009 WL 2991474, at *4 (Tenn. Crim. App. Sept. 18, 2009) ("The decision to allow a party to reopen its proof after closing rests within the sound discretion of the trial judge."). A trial court's decision allowing a

party to reopen its proof "will not be set aside unless there is a showing that an injustice has been done." Tuttle, 914 S.W.2d at 931 (citing State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)); see also White v. State, 497 S.W.2d 751, 753 (Tenn. Crim App. 1973). Furthermore, "The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent clear abuse of that discretion." State v. Guy, 165 S.W.3d 651, 662 (Tenn. Crim. App. 2004); see also State v. Hutchison, 898 S.W.2d 161, 166 ("A motion to sever is discretionary with the trial court, and the court's decision will not be reversed unless it clearly prejudiced the defendant."). A trial court may grant a severance of defendants during the trial if, "with consent of the defendants to be severed, the court finds a severance necessary to achieve a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(B).

As an initial matter, we note that, although the Defendant asserts that it was improper for the trial court to "declare a severance," no such declaration appears in the record. Indeed, the trial court announced that it was "inclined" to sever Martrevious's case from the Defendant's if Martrevious intended to testify and introduce the Defendant's prior convictions as a part of his defense of duress. However, severance based on that reasoning became unnecessary when Martrevious entered a plea of guilty. The trial court entered no order of a severance, nor did it affirmatively declare a severance at trial. Indeed, this court has held that "a change of plea by a co-defendant does not constitute a Bruton[4] violation nor entitle the remaining defendants to a severance and mistrial, where proper instructions are given by the trial court." Dorsey v. State, 568 S.W.2d 639, 643 (Tenn. Crim. App. 1978); see also State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981) (A guilty plea of a co-defendant "standing alone" does not require severance). Therefore, the mere fact of Martrevious's decision to plead guilty did not alone constitute a severance. Based on the record before us, we cannot conclude that a severance in fact occurred. Therefore, the Defendant's argument that the trial court improperly ordered a severance is misplaced.

Furthermore, we note that the only prejudice alleged by the Defendant as caused by the State reopening its case-in-chief and the resulting testimony of Martrevious was that it limited the Defendant's ability to thoroughly question prospective jury members regarding the potential effect of Martrevious's testimony and, therefore, denied him the right to be tried by a fair and impartial jury of his peers. However, no transcript of the jury selection process was included in the record on appeal. "It is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal." State v. Robinson, 73 S.W.3d 136, 154 (Tenn. Crim. App. 2001) ((citing State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim.

---

[4] See Bruton v. United States, 391 U.S. 123, 124 (1968).

App. 1987); State v. Rhoden, 739 S.W.2d 6 (Tenn. Crim. App. 1987)); see also State v. Draper, 800 S.W.2d 489, 495 (Tenn. Crim. App. 1990); Tenn. R. App. P. 24(b). This Court is "precluded from addressing an issue on appeal when the record fails to include relevant documents." Robinson, 73 S.W.3d at 154. Because the transcript of the jury selection process is not included in the record, we cannot address the Defendant's claim that he was prejudiced in the jury selection process. Therefore, we deem this issue to be waived. See id. ("By failing to include the transcript of the jury selection process in the record, the defendant has waived this issue.").

Finally, we note that "a final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); see also State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000). Our supreme court has stated that, "[t]he more the proof exceeding that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits." Id. Therefore, even where a trial court erred in its decision of whether to grant a severance, "the defendant must show that error probably affected the judgment before reversal is appropriate." State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999). Likewise, even where a trial court erred in allowing a party to reopen its proof, any such error is harmless if "the evidence was sufficient to sustain the defendant's conviction even without [the] testimony presented after proof was reopened." Tuttle, 914 S.W.2d at 931. In the instant case, the detailed testimony from four eyewitnesses was more than sufficient to sustain the Defendant's conviction beyond a reasonable doubt, even absent the testimony of Martrevious. Indeed, in his brief on appeal, the Defendant conceded that, because "[f]our witnesses testified for the State," Martrevious's testimony "could add nothing to the [S]tate's case." In light of the overwhelming evidence of guilt, we conclude that, even if the trial court did commit error, the resulting testimony of Martrevious did not affirmatively affect the outcome of the trial on the merits. Therefore, any error would have been harmless beyond a reasonable doubt. Tenn. R. App. P. 36(b).

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

-10-