IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 21, 2010

## JARRET ALAN GUY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-B-896    J. Randall Wyatt, Jr., Judge**

**No. M2009-00935-CCA-R3-PC - Filed February 28, 2011**

Petitioner, Jarret Alan Guy, appeals the dismissal of his petition for post-conviction relief in which he alleged that his trial counsel rendered ineffective assistance of counsel. Specifically, Petitioner contends that (1) counsel failed to file a motion to suppress his statement because Petitioner and his family were threatened by a police detective; and that (2) counsel failed to file a motion to suppress his statement based on Petitioner's alleged intoxication at the time of the interview. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

David R. Heroux, Nashville, Tennessee, for the appellant, Jarret Alan Guy.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, the State of Tennessee

## OPINION

### I. Background

Following a jury trial, Petitioner was convicted of facilitation of first degree premeditated murder, felony murder, and robbery. He was sentenced to life in prison without the possibility of parole for felony murder. The facilitation of first degree murder conviction

was merged with the felony murder conviction. He received a sentence of fifteen years for the robbery conviction to be served concurrently the sentence for felony murder. On appeal, this Court affirmed the convictions. *State v. Guy*, 165 S.W.3d 651 (Tenn. Crim. App. 2004). The facts surrounding Petitioner's convictions were summarized by this Court on direct appeal as follows:

> On July 18, 2000, Tony Roberts, who occasionally assisted the victim, eighty-two-year-old William Satterfield, by driving him to the grocery store and to doctor appointments, stopped to check on the victim and discovered that his car was gone. Although the victim did not drive, he had recently purchased a white, late-model Oldsmobile. A cushion had been left outside on the porch. Roberts waited on the porch and when the victim did not return within an hour, he asked some neighbors if they had seen the victim. After speaking with neighbors, Roberts felt that "there was something ... very much out of place" so he called a friend of the victim and the two found the front door unlocked. According to Roberts, "the house was in total shambles." At that point, Roberts telephoned the police and provided them with a description of the victim's car.
>
> Roberts testified that because the victim was distrustful of banks, he kept a large sum of cash at his residence. Roberts, who earlier had helped the victim prepare an inventory of his firearms, identified two shotguns and two handguns discovered after the arrest of the defendant and co-defendant. Roberts was also able identify the victim's "change tray," rings, and several pocket and wrist watches, all of which were found in a motel room where the defendant and co-defendant were staying.
>
> Metro Police Officer Paul Sharp, who was first to arrive on the scene, found no signs of a forced entry but described the house as "ransacked." He noted that the phone line had been "ripped out." A man's shoe was in the living room and its mate was in the back bedroom. Two rolls of duct tape were on a bed in the back bedroom and a phone was lying under the bed. The wires had been removed. When Officer Kevin Allen arrived to assist, he and Officer Sharp went into the basement of the house but were unable locate anyone inside. At that point, he called a supervisor to request additional units to canvass the neighborhood and provided a description of the victim's car to the dispatcher.
>
> Detective Jeff West and Officer Earl Hunter conducted a second search of the victim's residence and discovered the body in the basement underneath an

"eggshell" mattress and other debris. Officer Hunter discovered that the victim's legs had been tied with telephone cord and taped together with duct tape. His hands had been tied behind his back with telephone cord and taped together with duct tape. Two plastic grocery bags had been placed over his head and sealed around the neck with duct tape. There was "wadding" in the victim's mouth, which had been sealed with duct tape, and there were ligature marks around the neck.

Murder Squad Police Detective E.J. Bernard identified the co-defendant when some of his relatives, who were acquainted with the victim, suspected his participation in the crime. Fearing that he might return to the neighborhood and harm them, the relatives informed police that a man named "Jarret or Jerry" was traveling with the co-defendant. Other than some cash and a handgun, all of the victim's property was recovered.

Metro Police Officer Grant Carroll, who had received information about the victim's vehicle, discovered a vehicle matching the description backed into a parking space of a Super 8 Motel in Goodlettsville. As he and another officer approached the car, the defendant, who had been sitting in the driver's seat, stepped out and walked toward them. The defendant was ordered to the ground and handcuffed. The officers discovered a key card to one of the rooms and found the co-defendant, the defendant's wife, and the defendant's infant daughter inside. Police found clothing, towels, and jewelry wrapped inside a blanket inside the motel room. Two handguns, one with a wooden handle and one with a pearl handle, were also recovered from the room. More jewelry was found on a table and on a night stand.

At trial, Nora Campbell, the co-defendant's sister, testified that her brother and the defendant, along with his wife and infant daughter, spent the night at her apartment the night before the victim's body was discovered. She recalled that the group was traveling in a white car, which the defendant claimed to have borrowed from his brother-in-law. Ms. Campbell testified that the defendant and co-defendant brought guns, prescription drugs, "[p]ocketwatches, ... a wristwatch, and a ring" into her residence. According to Ms. Campbell, she refused their request to sell the prescription drugs for $3 per pill and asked them to leave the next day because she "felt like they had done something wrong." The defendant and his family left in the white car and Ms. Campbell drove her brother to the Super 8 Motel in Goodlettsville where the defendant and his family were staying. Ms. Campbell claimed that during their trip, the co-defendant admitted to her that they had "done something bad" and that

when she asked whether they had killed someone, the co-defendant remained silent.

Charles McEwen, an acquaintance of the defendant, testified that the defendant asked to leave two shotguns at his house for a few hours. McEwen stated that he consented but asked the defendant to put the guns in his barn so that his grandchildren would not find them.

Angela Danielle Guy, the defendant's wife and a witness for the state, testified that on the day before the offense, she overheard the co-defendant tell the defendant that he knew "how they could make some money." According to Ms. Guy, the co-defendant claimed "that his grandfather's friend, ... an old man, had a ... large sum of money in his house .... [and] went grocery shopping ... on Mondays." She recalled that on the following day, a Monday, the defendant and co-defendant left the Guy residence for approximately three to four hours and that upon their return, the defendant was driving the victim's white car. She stated that the defendant and co-defendant brought a number of stolen items into the residence. Later that evening, Ms. Guy and her infant daughter left the residence with the defendant and co-defendant and spent the night with Nora Campbell. Ms. Guy explained that they went to Ms. Campbell's residence "to get high" on "pills and crack" and upon leaving Ms. Campbell's residence, they checked into a room at the Goodlettsville Super 8 Motel, where they were found by the police. Ms. Guy identified a bassinet found in the trunk of the victim's car as belonging to her infant daughter. She testified that the police recovered several of the victim's belongings at her residence and recalled telling police that the victim's shotguns were at the McEwen residence.

In his initial interview with the police, the defendant claimed that the co-defendant arrived at his residence in the victim's car and told him that he had gone into the house of "a[n] old man that was good friends with his grandfather ... and tied him up." He denied any participation in the crimes or driving the car. He claimed that the co-defendant had the stolen car, two shotguns, three handguns, and some cocaine. The defendant admitted being "a crackhead, thief" but claimed that it was not his "nature" to kill. After Detective Bernard informed the defendant that Ms. Guy was cooperating with the authorities, the defendant stated that the "[o]ld man should have shot ... [the co-defendant]." The defendant then related that he and the co-defendant had gone to the victim's house and had visited on the porch for an hour when the co-defendant asked for a glass of water. After the co-defendant followed

-4-

the victim inside, the defendant heard "scuffling" and saw that the co-defendant had tied the victim up and placed him face down on the bed. The defendant claimed that he then walked away from the residence and did not see the co-defendant until later, when he was driving the victim's car. He asserted that he did not know that the victim had been killed but admitted that the co-defendant gave him $750 and that they traded one of the victim's shotguns for drugs and sold another to McEwen for $30. The defendant contended that the co-defendant admitted placing duct tape over the victim's mouth and a plastic bag over the victim's head. The defendant insisted that he "never put [his] hands on the [victim]."

During a second interview, the defendant again insisted that he knew nothing of the co-defendant's plan and asserted that when he asked the co-defendant what was going on, the co-defendant responded, "[M]an, just don't worry about [it]-just stay around." He claimed that he then walked down the street before returning to find that the victim's hands had been bound and the co-defendant was pointing a gun demanding to know the location of his cash. When the victim claimed that he spent all of his money on his car, the co-defendant took the wallet from the victim's pocket and forced the victim into a bedroom. According to the defendant, he agreed to watch the door but warned the co-defendant not to hurt the victim. The co-defendant placed the victim face down on the bed and bound his feet with a cord from the telephone. The defendant, who contended that he wanted to leave but was afraid that the co-defendant might shoot him, told police that the co-defendant filled a pillowcase with the victim's belongings and later placed a plastic bag over the victim's head, sealing it with duct tape before dragging him down the hallway. The defendant stated that he then left the victim's residence, walking to the co-defendant's grandmother's house where the co-defendant arrived a few minutes later in the victim's car. They drove to the defendant's residence, the co-defendant gave the defendant $740 dollars, and then they drove to north Nashville and sold two shot guns to McEwen for $30. Later, they returned to the defendant's residence, gathered their belongings, and drove to Ms. Campbell's residence.

Chief Medical Examiner Dr. Bruce Levy, who performed the autopsy, testified that the victim died during the afternoon hours of July 17, 2000, the day before police discovered the body. According to Dr. Levy, the cause of death was "a combination of manual strangulation and suffocation by a plastic bag." He testified that "[b]oth the manual strangulation or the plastic bag being placed over his head were, in and of themselves, ... capable of causing [the victim's]

-5-

death.... [B]oth of them played a role in his death in this case." The victim, who was five feet, five inches, in height, weighed only one hundred forty-three pounds. Markings on the victim's neck indicated the "pressure of the fingertips of somebody's hands." The victim also suffered a large number of blunt force injuries to the back of his head, his face, and his forehead. The doctor noted that there was "a series of lacerations ... on the right side of his face, in the cheek area, just in front of the ear and by the right eye." He also found a bruise "by the right shoulder, a scrape by the left shoulder, a bruise on the left side of the abdomen, and a series of bruises and ... scrapes to the back area." Dr. Levy stated that he was unable to determine the cause of the blunt force injuries or whether the injuries were inflicted by more than one person. He did find defensive wounds to the arms and hands of the victim.

*Id*. at 654 -657.

## II. Post-Conviction Hearing

Petitioner testified that at the time of his arrest, he was staying at the Super 8 Motel in Goodlettsville with his wife, Angela "Dana" Guy, and their five-month-old daughter, Brianna, who had medical issues and was on a heart monitor and breathing machine. Petitioner said that when police first arrived at the motel around 2:00 to 3:00 a.m., he was standing outside and co-defendant Jacob Campbell was inside the motel room with Petitioner's wife and daughter. Petitioner testified that he signed a consent form and allowed police to search the room because he did not "want them going over there and trying to just bust open the door with my wife and my child in there." He said that at the time, he had been on a ten or eleven day binge smoking cocaine, drinking, and not sleeping.

Petitioner testified that he was handcuffed, placed in a patrol car, and taken to the back of the motel by Detective E.J. Bernard and another officer. He said that neither of the two advised him of his *Miranda* rights, and he did not sign a waiver. Detective Bernard then asked him about the case. Petitioner testified that he initially denied knowing anything about the case, but Detective Bernard told him that he would make sure that Petitioner and his wife both received the death penalty, and their daughter would be placed in foster care. He said that he told Detective Bernard that his wife had no involvement in the offenses. Petitioner testified that he then decided to give a statement and tell police what they wanted to hear because he did not "want her getting in trouble, going to prison with no death penalty when she had nothing to do with it." He said that he was still under the influence of drugs at the time, and he did not sign a waiver.

Petitioner testified that he was transported to the Homicide Division approximately one hour later. Detective Bernard advised him of his *Miranda* rights, and he was interviewed by Detective Bernard and Detective Derry Baltimore. He said that Detective Bernard told him that his wife had been arrested and was in another room and that his daughter had been taken to social services. Petitioner testified that he did not pay attention when Detective Bernard advised him of his rights because he was worried about his wife and child and had already made up his mind to sign the waiver. He claimed that he was still under the influence of drugs when he signed the document. Petitioner testified that a couple of hours after the first interview, while still under the influence of drugs, he was taken from his cell for a second interview. He was not given a second *Miranda* warning. During the second interview, Petitioner testified that his story changed, and he was still concerned about his wife because he did not know where she was. He said that some of the things that he said to Detective Bernard were told outside the room and were not recorded.

Petitioner testified that although he had previous "brushes" with the law, he never had a case involving a suppression hearing. He said that trial counsel told him that his statements were damaging, and he asked trial counsel to file a motion to suppress the statements, which trial counsel said he would do. Petitioner claimed that trial counsel later met with him at "Charles Bass" and said that the motion had been denied. The statements were played for the jury during his trial. Petitioner said that while his case was on appeal, he learned that the suppression motion had never been filed. Petitioner said that he did not testify at trial, and the statements were the only evidence placing him at the victim's residence. He testified that there were no fingerprints or other physical evidence that placed him at the scene. However, he admitted that property from the victim's residence was found in his motel room.

On cross-examination, Petitioner felt that his statements should have been suppressed because in them he admitted to going to the victim's house to commit a burglary. However, he agreed that in the second statement, which was played to the jury, he never really confessed to having any part of the murder and said that he did not take anything. He placed all of the blame on his co-defendant, Jacob Campbell, and said that he went outside and waited when Campbell began assaulting the victim because he wanted no part of the offense. Petitioner testified that "parts" of his second statement were true, but he could not recall which portions were false.

Concerning the evidence against him, Petitioner acknowledged that he was arrested after exiting the victim's car, and some of the victim's property was found in his motel room. His wife was never arrested, and she testified against him at trial and said that he was in the victim's car with guns, jewelry, and coins taken from the victim's house. Mr. Campbell's sister also testified that Petitioner and Mr. Campbell left some of the stolen property at her

house, and Charles McEwen testified that Petitioner arrived at his house driving the victim's car and hid some of the victim's stolen guns there.

Petitioner testified that his statements to Detective Bernard and Baltimore were not voluntary because Detective Bernard threatened him with the death penalty, and he had been doing drugs and drinking and did not realize what was going on. Petitioner testified that he did not have any additional drugs or alcohol between his first and second statements, and he had been in his cell trying to sleep during that time. He said that at some point, Detective Bernard made reference to him being "higher than hell" when Detective Bernard asked about the guns. Petitioner said that he told detectives that he was "out of [his] mind."

Trial counsel testified that he was appointed to represent Petitioner in early 2001, and at the time, he had handled a number of both capital and non-capital cases either as lead counsel or co-counsel. He said that Petitioner had a number of pending cases at the time, and he was on probation in various counties. In one of the cases, Petitioner was charged with robbing his wife's step-grandfather, Mr. McDowell. Trial counsel testified that the facts of the case were similar to the robbery in the present case. However, he was successful in having the evidence from the McDowell case excluded from the trial in this case.

Trial counsel testified that he and Petitioner discussed "how the statement was, in fact, the most damaging information that a jury would hear." They also discussed various theories of how to keep the statement out. Trial counsel testified that he did not tell Petitioner that he filed a motion to suppress which was denied and that Petitioner's testimony was "flatly a lie." He said:

> What Mr. Guy had told me was at the time he made his statement that he was high. In reviewing the statement, taking into account that he claimed that he had been smoking crack cocaine, what had appeared that because of the lapse in time taking the latest time Mr. Guy provided, even this morning and looking at the time of the statement which is six hours later, that's inconsistent with someone still being high if they were smoking crack cocaine. It's been my experience in representing people charged with criminal offenses that if you smoke crack cocaine, the high will not last six, seven, eight hours. At most it will be thirty minutes to an hour, if it's a extraordinary amount of crack cocaine.

Trial counsel testified that he had reviewed the videotapes of the two statements. He thought that "there was a redacted version of the tape that was provided. The entire second tape was not played" because the later portion of the tape dealt more with the McDowell case. Transcripts were prepared of the portions of the tapes played for the jury.

-8-

Trial counsel testified that Petitioner never told him that Detective Bernard had threatened him with the death penalty. He said, "[a]nd I could not find anything that said that he had to give a statement to protect his wife from getting the death penalty." Trial counsel testified that if he had had "information that the Miranda waiver was based on a threat or a coercion, I would have investigated it and I would have tried to suppress the motion." He and Petitioner discussed Petitioner's statement and discovery, which included all of the police reports in the case. He was also given a copy of the waiver of rights form that Petitioner had signed.

Concerning the evidence against Petitioner, trial counsel stated:

Well, it's my understanding and not to speak for the state, by my recollections is that during the severance motion General Miller and General Hamm, both, represented to the Court that they were willing to proceed in a trial against Mr. Guy on the Satterfield murder case without using his statements if the severance was not granted. And I shared with Mr. Guy that that was my opinion that the state felt that its case was adequately strong enough to obtain a conviction even without his statement being used.

He said that the trial court granted a severance, and there were two trials. Co-defendant, Jacob Campbell, did not give a statement and was convicted of first degree murder. Trial counsel testified that Petitioner's wife's testimony was used by the State to prove all of the elements of felony murder. He said that the victim's property was recovered from Petitioner's motel room and from his residence.

On cross-examination, trial counsel testified that although Petitioner told him that he was high when he signed the waiver and gave his statement, "it was inconsistent with the content of what he was providing. It was inconsistent with his response to the questions." He said that Petitioner was lucid, and his responses were on point and appropriate. Trial counsel further testified:

It was inconsistent with the effects the crack cocaine he had told me about. And he did not tell anything about taking pills. My understanding was that the pills had been sold or traded for crack cocaine and that the focus was he was exclusively on crack cocaine. So to those extent his discussions with me about the statement was focused on was he high at the time from six, seven hours later.

Trial counsel agreed that Petitioner told detectives that he wished that someone would kill him and that he was tired of living. He felt that the statements were consistent with

"someone who is remorseful because a life of another person has just been taken." Trial counsel further agreed that in one of the tapes, Detective Bernard mentioned an earlier conversation with Petitioner. He did not recall asking Petitioner about the conversation.

Trial counsel testified that throughout the case, he was concerned that Petitioner might receive the death penalty. He said that his negotiations with State in seeking to remove the death penalty from consideration included discussions over the fact that Petitioner cooperated with police and had given a statement. When asked if he was concerned that the State might file a death notice if he sought a motion to suppress, trial counsel said:

> Well - - well up until the point they had announced, it was always a possibility. And we were still with adequate time to file a Motion to Suppress. After it was filed by that point the strategy for presenting the case had shifted more to I wasn't there. I didn't do it at all to if I was there, I didn't cause the killing. I did not go there with the intent to hurt or even the intent to steal.

Trial counsel pointed out that on the first tape, around 9:40 p.m., Petitioner said that he was high that morning. He said that Petitioner had talked about being high earlier at the time of his arrest.

## III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. 40-30-210(f). The trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id*.; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of

time they were made in light of all the facts and circumstances at that time. *Id*. at 690, 104 S.Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id*. Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. In cases involving a guilty plea, the petitioner must show prejudice by demonstrating that, but for counsel's errors, he or she would not have pleaded guilty but would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

Petitioner first argues that trial counsel was ineffective for failing to file a motion to suppress his statements to police because Detective E.J. Bernard threatened that Petitioner and his wife would received the death penalty and Petitioner's daughter would be placed in foster care if Petitioner did not make a statement. The post-conviction court considered this issue and found that trial counsel was not ineffective. The court noted that although there were references to prior interactions between Petitioner and Detective Bernard, there was no proof of questioning or threats of any kind. The trial court further noted that there were no coercive statements during the recorded interviews by Detective Bernard or Detective Baltimore. The court also reviewed the videotapes and found two references to Petitioner's wife and the "effect of Petitioner's statements on his wife." The trial court noted that during the first interview, the following took place:

| Detective Bernard: | I know one thing I don't want to see happen. And I, I don't know how to approach this. Okay, there was three people arrested this mornin' and . . . should we charge all three of those people with murder? |
|---|---|
| Petitioner: | No. |
| Detective Bernard: | Why not? |
| Petitioner: | Because my wife, she wasn't nowhere around. She was at home. |

Detective Bernard:          Okay, I'm inclined to go with that.  I have no problem with, with that . . .

Exh. 2(A) at 16.

The Court also finds that the following conversation occurred later in the first interview:

Detective Bernard:          . . . Do you want me to believe you?

Petitioner:                 Yep.

Detective Bernard:          Okay.  If I believe you then I'm gonna walk across the hall and arrest the other person that's told me otherwise 'cause that means one of you are lyin.  Either it's you or it's her.  Now which one is it?

Petitioner:                 I came home and was gettin' high in my house.

Detective Bernard:          Well, let's take the whole story.  'Cause I'm gettin tired and I know you are too.  But one person is lyin', either you or her.  Now which one is that?  Think about it before you answer it.  I want you just . . . I want you to just stop a minute.  Because now we're gettin' down to the real good plain old nitty gritty on this thing.  You know . . . now if she says that thing is, is green and you say it, it was red I, you know one of y'all is not tellin' the truth.  And that's what it's comin' down to.  Now the one thing I'm not gonna do.  You want to know?  I'm not gonna sit here and tell you what I want you to say.  You're gonna have to tell us the truth. Now with the truth we know whether that's the truth or not.  But understand we work with people, and we work with the District Attorney. Like I said - only one, you or her, can be telling the truth.

-12-

The trial court noted that the videotape of Petitioner's interviews showed that Petitioner changed his story about his participation in the crimes from him being on the porch during the crimes until he admitted to being in the house and witnessing the assault and asphyxiation of the victim. Both detectives were aware of the inconsistencies and "confronted the Petitioner with conflicting evidence, including the statements of his wife, in order to expose these inconsistencies." The trial court further found that the questions did not "constitute and explicit or implicit threat" against the welfare of Petitioner's wife or child. The court also noted that even though Petitioner claimed that because of the threats he was willing to say anything to protect his family, he denied any involvement in the murder, beyond his presence on the front porch, during the first interview.

The record supports the trial court's findings. The trial court clearly accredited trial counsel's testimony. Trial counsel testified the he and Petitioner discussed "how the statement was, in fact, the most damaging information that a jury would hear." They also discussed various theories of how to keep out the statement. Trial counsel testified that he did not tell Petitioner that he filed a motion to suppress which was denied and that Petitioner's testimony to the contrary was "flatly a lie." He and Petitioner discussed Petitioner's statement and discovery, which included all of the police reports in the case, and he was given a copy of the waiver of rights that Petitioner had signed. Petitioner never told trial counsel that Detective Bernard had threatened him in any way. Trial counsel said, "And I could not find anything that said that he had to give a statement to protect his wife from getting the death penalty." Trial counsel testified that if he had had "information that the Miranda waiver was based on a threat or a coercion," he would have investigated it and tried to suppress the motion.

Next, Petitioner contends that that trial counsel was deficient for failing to file a motion to suppress his statements based on his alleged intoxication at the time of his interviews. In considering this ground, the post-conviction court stated:

The Court finds that the Petitioner testified that he was under the influence of alcohol and crack cocaine prior to his arrest between 2:00 and 3:00 A.M. The Court finds that Petitioner was not interviewed until after 9:00 A.M. and then again at 9:00 P.M. that night - six and eighteen hours, respectively, after his alleged consumption of these drugs. The Court finds that the Petitioner's drug use would probably not have affected his first statement to police at 9:00 A.M. and would definitely not have affected his second statement at 9:00 P.M. The Court has also reviewed the tapes of both interviews and finds that the Petitioner appeared to comprehend the questions asked of him with no signs of intoxication.

-13-

Again, the record supports the post-conviction court's findings. Trial counsel testified that Petitioner told him that he was high at the time he made the statements. However, he felt that this was inconsistent with the information the Petitioner had given him about the last time that he smoked crack cocaine. Trial counsel said:

> In reviewing the statement, taking into account that he claimed that he had been smoking crack cocaine, what had appeared that because of the lapse in time taking the latest time Mr. Guy provided, even this morning and looking at the time of the statement which is six hours later, that's inconsistent with someone still being high if they were smoking crack cocaine. It's been my experience in representing people charged with criminal offenses that if you smoke crack cocaine, the high will not last six, seven, eight hours. At most it will be thirty minutes to an hour, if it's a extraordinary amount of crack cocaine.

Trial counsel further testified that Petitioner was lucid during the interviews, and his responses were on point and appropriate. Although Petitioner told him that he was high when he signed the waiver and gave his statement, "it was inconsistent with the content of what he was providing. It was inconsistent with his response to the questions."

Finally, even if counsel's performance was deficient for failing to file a motion to suppress Petitioner's statements, Petitioner has failed to show any prejudice because there was overwhelming proof of Petitioner's guilt even without the statements. Trial counsel testified that during the severance motion, the State informed the trial court that it was willing to proceed to trial against Petitioner without using his statements if severance was not granted. He also told Petitioner that it was his opinion that the State felt that its case was strong enough to obtain a conviction without his statement being used. Trial counsel also pointed out that Petitioner's co-defendant was convicted of first-degree murder without the use of any statement made by the co-defendant. Trial counsel testified that the victim's property was recovered from Petitioner's motel room and from his residence, and Petitioner's wife's testimony was used by the State to prove all of the elements of felony murder.

At the post-conviction hearing, Petitioner acknowledged that he was arrested after exiting the victim's car, and some of the victim's property was found in his motel room. At trial, his wife testified that he was in the victim's car shortly after the homicide with guns, jewelry, and coins taken from the victim's house. Jacob Campbell's sister also testified that Petitioner and Mr. Campbell left some of the stolen property at her house, and Charles McEwen testified that Petitioner arrived at his house driving the victim's car and hid some of the victim's stolen guns there.

We conclude that Petitioner has failed to show that trial counsel's assistance fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance. Petitioner is not entitled to relief on this issue.

We also note that Petitioner framed some of issues in his appellate brief to seemingly argue that he was entitled to post-conviction relief independent of ineffective assistance of counsel because the police obtained Petitioner's statements by threats, his will was overborne by the threats, and the waiver of his *Miranda* rights was not voluntary. To the extent he asserts these arguments independent of a claim of ineffective assistance of counsel, they are waived. The issues should have been raised on direct appeal and are not proper for post-conviction relief. *See* Tenn. Code Ann. 40-30-106(g).

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE

-15-