IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 17, 2017 Session

## STATE OF TENNESSEE v. GARY E. FLOYD

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-1462     Monte D. Watkins, Judge**

_____

### No. M2017-00272-CCA-R3-CD

_____

The Defendant, Gary E. Floyd, was indicted on one count of attempted first degree murder, a Class A felony; and one count of employment of a firearm during the commission of a dangerous felony, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-202, -17-1324. Following a jury trial, the Defendant was convicted of employment of a firearm during the commission of a dangerous felony and the lesser-included offense of attempted second degree murder, a Class B felony. See Tenn. Code Ann. §§ 39-12-101, -13-210. The trial court imposed a total effective sentence of fourteen years. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction for attempted second degree murder; (2) that the State withheld exculpatory evidence; (3) that the trial court failed to instruct the jury on the lesser-included offenses of attempted voluntary manslaughter and possession of a firearm with the intent to go armed during the commission of a dangerous felony; (4) that the trial court committed several errors when instructing the jury on self-defense; and (5) that he is entitled to a new trial based upon cumulative error.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

C. Ronald Lux (at trial and on appeal) and John Michael Ballard (at trial), Nashville, Tennessee, for the appellant, Gary E. Floyd.

_____

[1] For the sake of clarity, we have reordered and renumbered the issues from how they appear in the Defendant's brief.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Mary Kristen Kyle-Castelli and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

This case arose from the shooting of the victim, Jason Rhodes, on the afternoon of July 16, 2014. Mr. Rhodes testified that in July 2014 he was living with his mother, Sharon Rhodes. Mr. Rhodes's ex-girlfriend, Shannon Haneen,[2] lived "[r]ight across the street" from him. Mr. Rhodes testified that sometime in the spring of 2014 he loaned Ms. Haneen $200 and that it was not until July 15, 2014, that Ms. Haneen's roommate paid him back. In the interim, Ms. Haneen had started dating the Defendant. Mr. Rhodes testified that he had known the Defendant for "[s]omething like" ten years and that he was not bothered by the Defendant's relationship with Ms. Haneen.

Mr. Rhodes testified that on July 16, 2014, he was at work when one of his sisters called him and told him that the Defendant had put "a hit on [his] head." However, Mr. Rhodes testified that he was not scared of the Defendant and did not take his threat seriously. Mr. Rhodes recalled that, when he got home from work that afternoon, he took a shower and then went outside to talk to his relatives. Mr. Rhodes further recalled that his mother, two of his sisters, his brother, his cousin, and his daughter were all at his house that afternoon. Mr. Rhodes testified that he was only wearing "[s]ome black cargo shorts" and that he did not have a weapon.

As he was standing out in the yard, Mr. Rhodes saw the Defendant in the passenger seat of a car coming down the street. Mr. Rhodes testified that he "flagged [] down" the car and that he and the Defendant "just start[ed] talking." According to Mr. Rhodes, he asked the Defendant about the "bounty" and if the Defendant "wanted to kill" him, but the Defendant "didn't say [any]thing." The Defendant got out of the car, and Mr. Rhodes asked him about the "bounty" again while they both stood on the sidewalk. Mr. Rhodes testified that the Defendant again "didn't say [any]thing." Instead, the Defendant walked into Ms. Haneen's house. Mr. Rhodes testified that these exchanges with the Defendant were not "heated."

According to Mr. Rhodes, the Defendant came out of Ms. Haneen's house about "five or ten minutes" later. Mr. Rhodes recalled that he was standing on the sidewalk in

---

[2] There was confusion at trial about whether Ms. Haneen was named Shannon Haneen, Haneen Shannon, or Haneen Shenen. Through most of the trial Ms. Haneen was referred to as Shannon Haneen, and that is how we will refer to her in this opinion.

front of "[t]he next-door neighbor's residence" and was talking to the man who had driven the Defendant. The Defendant appeared to be talking on his cell phone. Mr. Rhodes estimated that his relatives were about ten feet away from where he was standing on the sidewalk. Mr. Rhodes testified that none of his relatives had a weapon that afternoon.

According to Mr. Rhodes, his back was turned to the Defendant when "someone across the street hollered out, '[H]e got a gun.'" Mr. Rhodes testified that the Defendant shot him "[o]n [his] left side" as he was turning around. Mr. Rhodes estimated that the Defendant was about four feet away when he shot him. Mr. Rhodes testified that he did not remember much of what happened after he was shot. Mr. Rhodes's nephew drove him to the hospital. Mr. Rhodes testified that "the bullet nicked [his] aorta, tore [his] intestines, and [] messed up [his] pancreas." Mr. Rhodes further testified that he was also diagnosed with post-traumatic stress disorder.

Mr. Rhodes testified that about six months before trial, the Defendant's brother "pulled up on [him], talking about somebody want[ed] to talk to [him]" and gave him a cell phone. According to Mr. Rhodes, the Defendant was on the phone. The Defendant told him that "this wasn't supposed to happen" and offered to pay Mr. Rhodes $3,000 if he did not show up for court.

Mr. Rhodes's aunt, Deborah Jarrett, testified that she was in Mr. Rhodes's driveway helping her paralyzed nephew, Tavaris Smith, out of the car about an hour to an hour and a half before the shooting. Ms. Jarrett testified that she saw the Defendant walking down the street. Ms. Jarrett explained that she recognized the Defendant from his "[h]anging around the neighborhood." Ms. Jarrett testified that she saw a "dude [] walking up behind" the Defendant and that she overheard the Defendant ask the man if he wanted to "make [$]2,500."

Ms. Jarrett testified that the man, whom she did not know, responded, "Where?" According to Ms. Jarrett, the Defendant then "pointed dead at" Mr. Rhodes's house. Ms. Jarrett explained that she knew the Defendant "was specifically referencing" Mr. Rhodes because the Defendant "had kept calling the phone and threatening" Mr. Rhodes. A short time later, the Defendant rode by Mr. Rhodes's house on a bicycle, and Mr. Rhodes's sister, Linda Rhodes,[3] asked the Defendant why he had "[$]2,500 on [her] brother['s] head." According to Ms. Jarrett, the Defendant responded, "I can't talk to y'all. Y'all women." The Defendant then rode away on his bicycle.

---

[3] Because several witnesses share the same surname, we will refer to some witnesses by their first names to avoid confusion. No disrespect is intended.

Ms. Jarrett testified that around 4:00 p.m., Mr. Rhodes came home from work, "took off his work clothes, put on his shorts[,] and was sitting out there in the yard" when the Defendant "came up in the car." According to Ms. Jarrett, the Defendant said, "[W]hat's up, Jason?" Ms. Jarrett testified that the Defendant and Mr. Rhodes then "had some words." Ms. Jarrett recalled Mr. Rhodes's telling the Defendant that they could "fist fight" and that he did not "carry [any] guns." According to Ms. Jarrett, the Defendant "left on the phone" and went to Ms. Haneen's house without responding to Mr. Rhodes.

Ms. Jarrett testified that she and three other relatives were standing by Mr. Rhodes. Ms. Jarrett further testified that neither Mr. Rhodes nor any of his relatives were armed with a weapon that afternoon. According to Ms. Jarrett, she saw the Defendant come out of Ms. Haneen's house "eating some M&Ms" and talking on his cell phone. The Defendant started walking toward Mr. Rhodes and "looked around" before he hung up his cell phone.

According to Ms. Jarrett, the Defendant said to Mr. Rhodes, "What's up, b---h?" Ms. Jarrett testified that as Mr. Rhodes started to turn around, the Defendant pulled out a "little bitty handgun" from his right front pocket and shot Mr. Rhodes without looking at him. The Defendant then "took off running." Ms. Jarrett testified that no one from the victim's family approached the Defendant when he came back out of Ms. Haneen's house and that the Defendant waited until he "got up on" Mr. Rhodes to shoot him.

Mr. Rhodes's sister, Linda, testified that when she got to Mr. Rhodes's house on the afternoon of July 16, 2014, she heard that the Defendant "had a hit on [Mr. Rhodes's] head." A short time after Mr. Rhodes got home from work, a car with the Defendant in it pulled up. Linda testified that Mr. Rhodes and the Defendant "had some words back and forth" as the Defendant got out of the car. According to Linda, Mr. Rhodes asked the Defendant if there was "a hit out on [his] head," and the Defendant "was like[,] '[W]hat you talking about[?]'" Linda testified that she was standing next to Mr. Rhodes during this conversation and that she did not hear Mr. Rhodes challenge the Defendant to a fist fight.

Linda testified that Mr. Rhodes was standing with her and "a couple more people" talking as the Defendant got out of the car and went to Ms. Haneen's house. Linda further testified that the rest of her family was in the front yard and that none of them, including Mr. Rhodes, had a weapon. At no point did Linda think that Mr. Rhodes's conversation with the Defendant was about to turn into a fight. After a short period of time, the Defendant came back outside and started walking toward Mr. Rhodes. Linda testified that she did not see anything in the Defendant's hands as he walked toward Mr. Rhodes. The Defendant said, "[W]hat's up?" A "[s]hot was fired," and the Defendant

then "took off running." Linda testified that the Defendant looked and aimed at Mr. Rhodes when he shot him.

Mr. Rhodes's other sister, Jermira Rhodes, testified that Mr. Rhodes "flagged [the Defendant] down" when his car pulled up by asking, "[B]---h, do you got a hit on my head?" Jermira testified that she did not hear how the Defendant responded. She saw the Defendant get out of the car and go into Ms. Haneen's house. Jermira further testified that Mr. Rhodes did not move toward the Defendant and that none of her family, including Mr. Rhodes, had a weapon that day.

According to Jermira, when the Defendant came out of Ms. Haneen's house, he was eating candy and "acting like he was talking on the phone." Jermira recalled that the Defendant had his cell phone pinned between his ear and his shoulder as he put candy in his mouth. According to Jermira, none of her family approached the Defendant when he came back outside. Jermira testified that the Defendant then said, "[W]hat's up, smart brother?" Jermira further testified that Mr. Rhodes's back was to the Defendant and that the Defendant shot Mr. Rhodes as he was turning around. According to Jermira, the Defendant dropped his cell phone and "took off running." Jermira testified that she could not tell if the Defendant was aiming at Mr. Rhodes when he fired the gun.

Mr. Rhodes's nephew, Aaron Knight, testified that about an hour before the shooting, the Defendant was on a bicycle and that some of Mr. Rhodes's relatives angrily confronted the Defendant "about a bounty being put on [Mr. Rhodes's] head." Mr. Knight testified that the Defendant "was trying to ignore" Mr. Rhodes during the first interaction between the Defendant and Mr. Rhodes. Mr. Knight further testified that he was standing next to Mr. Rhodes. Mr. Knight recalled that Mr. Rhodes was on the sidewalk and talking to the driver of the car, who was standing on the sidewalk on the other side of the street.

Mr. Knight testified that he later saw the Defendant with a cell phone at his ear and candy in his hand as he approached Mr. Rhodes. According to Mr. Knight, the Defendant pulled a gun from his waistband, aimed at Mr. Rhodes, and shot Mr. Rhodes. Mr. Knight testified that Mr. Rhodes did not have a weapon and that no one had yelled at the Defendant when he came back outside from Ms. Haneen's house. Mr. Knight recalled that "[h]alf of the whole neighborhood was out" when Mr. Rhodes was shot. Mr. Knight testified that he drove Mr. Rhodes directly to the hospital after the shooting. Mr. Knight recalled that Mr. Rhodes was "moaning in pain and praying" on the way to the hospital.

Metropolitan Nashville Police Department (MNPD) Officer William Holls testified that he was one of the first officers to respond to the scene of the shooting. Officer Holls recalled that Mr. Rhodes had already been taken to the hospital by the time

he got to the scene. Officer Holls further recalled that "[i]t was very chaotic," that "a lot of people [were] outside," and that "[p]eople were yelling and running around the scene." According to Officer Holls, several witnesses at the scene identified the Defendant as the shooter, referring to him by his nickname, "Lil' Man."

MNPD Sergeant Alfredo Arevalo testified that he was the lead detective in this case. Sgt. Arevalo recalled that he arrived on the scene after Mr. Rhodes had been taken to the hospital and that there were "a lot of people outside." Sgt. Arevalo testified that he spoke to several "members of the Rhodes family" and that they identified the Defendant as the shooter. Sgt. Arevalo further testified that he heard about the "hit" the Defendant had allegedly placed on Mr. Rhodes from several witnesses, but he was not sure if any of the witnesses had firsthand knowledge of the "hit." However, Sgt. Arevalo mentioned it in his report because "all of the witnesses had such consistent statements." Sgt. Arevalo testified that no guns were found at the scene nor were any other weapons, such as a baseball bat.

Sgt. Arevalo testified that one witness, Keenan Mason, told him that the Defendant and Mr. Rhodes "had gotten into an argument" the night before the shooting over the $200 Mr. Rhodes had loaned to Ms. Haneen. Mr. Mason also stated that Ms. Haneen had said "she was going to have [Mr. Rhodes] shot," but Mr. Mason "didn't take that [statement] seriously." Sgt. Arevalo later spoke to Mr. Rhodes at the hospital and recalled that Mr. Rhodes was "in pain" during their conversation. MNPD Detective Andrew Davis spoke to Mr. Knight and Mr. Knight's mother, Stacy Knight, at the hospital, and they both identified the Defendant as the shooter. No weapons were recovered from the hospital or Mr. Knight's car. Sgt. Arevalo testified that the Defendant was not apprehended until August 11, 2014.

The Defendant's uncle, Marcus Bradley, testified that the Defendant was "real respectable," quiet, kept to himself, and not violent. Mr. Bradley explained that the Defendant tried "to avoid confrontation." Mr. Bradley testified that he had never seen the Defendant with a gun, but that he would not be surprised if the Defendant carried a gun because both the Defendant and his brother had previously been shot. Mr. Bradley also testified that the neighborhood where the shooting occurred was a "high crime" area. Mr. Bradley could not recall the date, but he recalled that sometime before the shooting, the Defendant had called and said that Mr. Rhodes was threatening him and that "[s]ome females . . . had surrounded him." Mr. Bradley admitted that the Defendant did not tell him he was accused of shooting someone. Instead, Mr. Bradley learned this from the Defendant's siblings.

The Defendant testified that he had known Mr. Rhodes for approximately ten years and that he never had any arguments with Mr. Rhodes during that time. The Defendant admitted that he was on probation in July 2014 and that the terms of his

probation forbade him from possessing a gun.  However, the Defendant testified that he carried a gun every day "for protection."  The Defendant explained that he had "been shot before" and that the neighborhood where he lived was "somewhere you need[ed] a gun to protect yourself."  The Defendant also admitted that he had a prior conviction for criminal impersonation.

The Defendant confirmed that in July 2014 he was living in Ms. Haneen's house across the street from Mr. Rhodes.  Despite this, the Defendant testified that he had no contact with Mr. Rhodes's family before July 16, 2014.  The Defendant claimed that he was present when Ms. Haneen's roommate repaid Mr. Rhodes's $200 loan on July 15, 2014.  The Defendant testified that Mr. Rhodes was angry and arguing with Ms. Haneen that night.  However, the Defendant also claimed that he never spoke to Ms. Haneen about the $200 loan.

The Defendant testified that the next day, he "was minding [his] own business," riding a bicycle, when four women "surrounded" him.  The Defendant claimed that the women were "real hostile" and that "[t]hey all [were] yelling" at him.  The Defendant further claimed that the women were "telling [him that] they [were not] losing another brother" and "never asked [him] why."  The Defendant denied taking out "a bounty" on Mr. Rhodes and claimed that the incident on the bicycle was the first time he heard about the alleged "hit."  The Defendant stated that Ms. Jarrett was lying about his offering a man $2,500 to kill Mr. Rhodes.  The Defendant admitted that he was armed with a gun during this incident, while the women had no weapons.

The Defendant testified that he rode away from the women on his bicycle and went to a nearby store.  The Defendant was at the store when his friend, Montress Miller, pulled up in his car.  The Defendant decided that he "was gonna ride with him" for the afternoon.  The Defendant testified that after thirty minutes, he and Mr. Miller went back to Ms. Haneen's house so the Defendant could "pick up [his] antibiotics" because he had "just got bit by a spider."  The Defendant testified that Mr. Rhodes and his family were outside when he and Mr. Miller drove up to Ms. Haneen's house.  According to the Defendant, Mr. Rhodes was mad and "getting in the street, flagging the car down."  The Defendant testified that Mr. Rhodes "ran up on the car and he was like[,] '[W]hat they talking about[?]'"  The Defendant claimed that he tried to ignore Mr. Rhodes, but that he eventually got "short" with him and told Mr. Rhodes that he "didn't know what they [were] talking about."

The Defendant testified that he got out of the car and "went in [Ms. Haneen's] house to get [his] antibiotics."  According to the Defendant, when he came back outside, Mr. Rhodes and his family were across the street and there "was a lot" of Mr. Rhodes's family outside, "more than ten of them."  The Defendant claimed that he stood on the porch talking on his cell phone.  However, the Defendant could not recall to whom he

was talking.  The Defendant denied that he was eating candy when he came back outside.  The Defendant claimed that he got off the phone and "was just trying to leave" when he saw Mr. Rhodes and his family cross the street and approach him.  The Defendant explained that "[a]s [he] was coming down the stairs [of Ms. Haneen's porch], [he] was approached by [Mr. Rhodes], his sister, and his cousins and his nephews.  Like all of 'em."

The Defendant estimated that he was surrounded by seven or eight people.  The Defendant claimed that Mr. Rhodes was shirtless and directly in front of him, but he admitted that Mr. Rhodes did not have a weapon.  The Defendant further claimed that Mr. Knight was standing next to Mr. Rhodes and holding a baseball bat.  The Defendant also claimed that another man was on the other side of Mr. Rhodes with "like baseball gloves on."  The Defendant testified that he was also afraid of Mr. Rhodes's sisters because he "knew they could do damage too[,] . . . [t]hey all weighed approximately 200 pounds" and he "was like 140 something at the time."  The Defendant claimed that Mr. Rhodes "was real hostile" and that he "could tell . . . [that] [t]hey all [were] ready to fight."

The Defendant claimed that Mr. Rhodes and his family were all "in reaching distance."  The Defendant further claimed that Mr. Knight said something that made him think that "they [were] ready to do something" and that Mr. Knight "was like closing in on [him] with the bat in his hand."  The Defendant explained that Mr. Knight was so close that he thought Mr. Knight "was gonna swing the bat."  The Defendant testified that he "really was just like scared for [his] life at the time."  The Defendant reiterated that Mr. Rhodes and his family were "so close" that he "just thought [he] was gonna get hit by the bat."  The Defendant also claimed that Mr. Rhodes "made [a] movement[] like" he was about to hit the Defendant.

The Defendant testified that he "just didn't know what was going to happen" and that he was afraid for his life, so he pulled "a small caliber pistol" from his right front pocket.  The Defendant testified that he did not have time to call 911 while Mr. Rhodes and his family were approaching him, and he felt that the gun "was the only thing that was going to save [his] life."  The Defendant claimed that he did not look or aim when he pulled out the gun, he "just shot the gun" one time.  The Defendant denied that Mr. Rhodes was standing on the sidewalk when he was shot.  Rather, the Defendant claimed that Mr. Rhodes was standing in the street. The Defendant further claimed that he did not intend to shoot Mr. Rhodes that day.  The Defendant explained that it did not matter who was standing in front of him, "[w]hoever would've been right there would've got[ten] shot."

The Defendant testified that after he shot Mr. Rhodes, he "[j]ust r[a]n" and "never looked back."  According to the Defendant, he ran "to a friend's house" and his friend

gave him a ride out of the neighborhood. The Defendant testified that he disposed of the gun the next day. The Defendant further testified that he did not tell anyone what happened because he "was scared." The Defendant explained that he was scared to turn himself in because the police had told his grandmother that they would shoot him if they caught him with a gun. The Defendant admitted that he was not arrested until the middle of August 2014. The Defendant denied having spoken to Mr. Rhodes since the shooting. The Defendant claimed that Mr. Rhodes and his family had "said a lotta stuff that wasn't true" during the trial.

Based upon the foregoing, the jury convicted the Defendant of employment of a firearm during the commission of a dangerous felony and the lesser-included offense of attempted second degree murder. Following a sentencing hearing, the trial court imposed a sentence of eight years for the attempted second degree murder conviction and a sentence of six years for the employment of a firearm conviction. The trial court ordered the sentences to be served consecutively for a total effective sentence of fourteen years. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for attempted second degree murder. The Defendant does not dispute that he shot Mr. Rhodes. Rather, the Defendant argues that "the evidence showed that [he] acted in self-defense" and that "the State failed to negate" his claim of self-defense. The State responds that the evidence was sufficient to sustain his conviction for attempted second degree murder.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v.

Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

In Tennessee, a person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

The Defendant's argument relies solely on his testimony that, immediately prior to the shooting, he was surrounded by Mr. Rhodes and his family and that they "approach[ed] him in a way that led him to believe that he was about to be attacked." This argument ignores the testimony of Mr. Rhodes, as well as the litany of other eyewitnesses, who all testified that Mr. Rhodes was standing on the sidewalk across the street with his back to the Defendant and unarmed when the Defendant crossed the street, called to Mr. Rhodes, and shot Mr. Rhodes as he was turning around. Mr. Rhodes and the other eyewitnesses all testified that neither Mr. Rhodes nor his family had approached or yelled at the Defendant immediately prior to the shooting. Likewise, they all testified that Mr. Rhodes and his relatives were unarmed. Accordingly, we conclude that it was well within the province of the jury to accredit the testimony of Mr. Rhodes and his relatives over the Defendant's testimony and reject the Defendant's claim of self-defense.

## II. Brady Violation

The Defendant contends that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). The Defendant argues that the State withheld

-10-

a police report and a video of an assault committed against Ms. Haneen "just hours after[]" the shooting and purportedly by relatives of Mr. Rhodes. Specifically, the Defendant argues that this evidence "would have bolstered [his claim] of self-defense" by showing that he had reason to fear "all of [Mr. Rhodes's] family members [who had] surround[ed] him." The Defendant also argues that this evidence was "possible impeachment material for the State's witnesses." The State responds that there was no Brady violation as this evidence was "neither relevant nor material to the [D]efendant's claim of self-defense, nor [did] it reflect on the credibility of the State's witnesses."

On the second day of trial, defense counsel stated that after numerous attempts to contact Ms. Haneen, he had "finally got[ten] ahold of her" during the "lunch break." Defense counsel further stated that Ms. Haneen told him that she had been assaulted by "several of the [State's] witnesses" after the shooting and that there was a video recording of this incident. Defense counsel argued that this evidence was relevant to the Defendant's "theory of self-defense" and to impeach the State's witnesses. The trial court ruled that this evidence would not have been admissible because it "happened after the incident" and would not "go to self-defense." Defense counsel attempted to cross-examine Jermira Rhodes about the assault on Ms. Haneen, but the trial court sustained the State's objection on relevancy grounds.

The next day, defense counsel asked for a continuance because he was unable to locate Ms. Haneen. The trial court denied the request and defense counsel again raised the issue of the police report and video. The trial court again found that the evidence was not relevant to the Defendant's claim of self-defense. Defense counsel later made an offer of proof, calling MNPD Officer Lindsey Smith to testify. Officer Smith was the responding officer to the assault of Ms. Haneen. Officer Smith's report listed the assailant as "Mody Rhodes." The brief video showed a woman stomping, kicking, and punching a woman lying on the ground and a second woman joining the assault at the end of the video. Officer Smith testified that she was unable to identify who was on the video. The prosecutor informed the trial court that the assault case was ultimately dismissed.

In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). To establish a Brady violation,

> a defendant must show that: (1) the defendant requested the evidence (unless the evidence is obviously exculpatory, in which case the prosecution is bound to produce the information, without a request); (2) the

-11-

State suppressed evidence in its possession; (3) the suppressed evidence was favorable to the defendant; and (4) the evidence was material.

State v. Jackson, 444 S.W.3d 554, 594 (Tenn. 2014). Here, the Defendant has failed to establish that the evidence of the assault on Ms. Haneen was material. For purposes of a Brady violation, "[e]vidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Johnson, 38 S.W.3d at 58 (quoting State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995)).

With respect to the Defendant's argument that this evidence "would have bolstered [his claim] of self-defense," we note that "[t]he general rule is that a defendant may use evidence of specific prior acts of violence by the victim against third parties to corroborate the defendant's theory that the victim was the first aggressor." State v. Chancy Jones, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *7 (Tenn. Crim. App. Apr. 5, 2012) (emphasis added). Similarly, "when a defendant seeks to use such evidence to establish the defendant's own fear of the victim[,] . . . the defendant must testify that he or she was aware of the victim's prior acts of violence against third parties at the time of the alleged self-defense." Id. at *7 n.6. As such, the evidence regarding the assault on Ms. Haneen was not admissible to support the Defendant's claim of self-defense as it did not involve the victim, Mr. Rhodes. Moreover, it was not a prior act of violence. To the extent the Defendant argues that it would have established his fear of Mr. Rhodes's relatives, the Defendant was unaware of the event at the time of the alleged self-defense.

With respect to the Defendant's argument that this evidence was "possible impeachment material for the State's witnesses," Tennessee Rule of Evidence 608(b) provides that "[s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness . . . [may] be inquired into on cross-examination," but "may not be proved by extrinsic evidence." (Emphasis added). This court has previously held that assaultive conduct is not probative of a witness's character for truthfulness. State v. James Thomas Manning, No. M2004-03035-CCA-R3-CD, 2006 WL 163636, at *6 (Tenn. Crim. App. Jan. 24, 2006). Therefore, the evidence was not "possible impeachment material for the State's witnesses." Accordingly, we conclude that this issue is without merit.

### III. Lesser-Included Jury Instructions

The Defendant contends that the trial court failed to instruct the jury on the lesser-included offenses of attempted voluntary manslaughter and possession of a firearm with the intent to go armed during the commission of a dangerous felony. The Defendant argues that the trial court should have instructed the jury as to these lesser-included

offenses because each was a lesser-included offense of one of the charged offenses and that "the evidence in the record would [have] legally support[ed] a conviction for the lesser[-]included offense[s]." The State responds that the evidence at trial did not warrant an instruction on attempted voluntary manslaughter. The State further responds that "the [D]efendant's employment of [a] firearm [was] uncontroverted"; therefore, "no reasonable jury would have convicted [him] on the lesser-included offense of possession of a firearm during the commission . . . of a dangerous felony."

Prior to trial, the Defendant filed a written request that the jury be instructed on attempted voluntary manslaughter and possession of a firearm during the commission of a dangerous felony as lesser-included offenses of the charged offenses. The trial court stated that it would instruct the jury on the lesser-included offenses "required by law." Regarding attempted voluntary manslaughter, the trial court stated that it would only instruct the jury on that offense if it was warranted by the evidence at trial. Ultimately, the trial court did not instruct on either of the requested lesser-included offenses.

"Whether the trial court properly instructed the jury on a certain offense is a mixed question of law and fact," which we review de novo with no presumption of correctness. State v. Howard, 504 S.W.3d 260, 267 (Tenn. 2016). A trial court must instruct the jury on a lesser-included offense if it "determines that any evidence as to a lesser-included offense exists that reasonable minds could accept and that the evidence, viewed liberally in the light most favorable to the lesser-included offense, is legally sufficient to support a conviction." Id. at 268.

### A. Attempted voluntary manslaughter

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Attempted voluntary manslaughter is a lesser-included offense of attempted first degree murder. See Tenn. Code Ann. § 40-18-110(g)(2) (providing that voluntary manslaughter is a lesser-included offense of "premeditated first degree murder and second degree murder); State v. Sims, 45 S.W.3d 1, 21 (Tenn. 2001) (voluntary manslaughter is a lesser-included offense of first degree murder under part (b) of the test provided in State v. Burns, 6 S.W.3d 453 (Tenn. 1999)).

Here, there was no evidence presented at trial that the Defendant acted in a state of passion produced by adequate provocation. Mr. Rhodes and the other eyewitnesses who testified for the State all testified that the Defendant's shooting of Mr. Rhodes was unprovoked. They testified that Mr. Rhodes was standing on the sidewalk, unarmed, and with his back to the Defendant when the Defendant approached Mr. Rhodes, called out to him, and shot him as he was turning around. Further, they all denied that Mr. Rhodes or

-13-

any member of his family was armed or had approached the Defendant when he came back outside from Ms. Haneen's house. The Defendant and Mr. Rhodes "had some words" a few minutes before the shooting, but generally, "the law regards no mere epithet or language, however violent or offensive, as sufficient provocation for taking [a] life." Freddo v. State, 155 S.W. 170, 172 (Tenn. 1913). As such, there was nothing in the State's evidence that would be legally sufficient to support a conviction for attempted voluntary manslaughter.

Nor did the Defendant's testimony establish that he acted in a state of passion produced by adequate provocation. The Defendant did claim that Mr. Rhodes was "hostile" and "made [a] movement[] like" he was about to hit the Defendant. However, much of the Defendant's testimony was focused on his claim that he was surrounded by Mr. Rhodes and his relatives immediately before the shooting. Specifically, the Defendant focused on his claim that he was "scared for [his] life" because he thought Mr. Knight "was gonna swing the bat" and hit him. The Defendant further claimed that Mr. Knight had said something that made him think "they [were] ready to do something." Moreover, the Defendant testified that he did not intend to shoot Mr. Rhodes, that he did not aim at Mr. Rhodes, and that it did not matter who was standing in front of him, "[w]hoever would've been right there would've got[ten] shot."

It has long been held under Tennessee law, and at common law, that a murder will only be reduced to voluntary manslaughter when the provocation was caused by the victim. See State v. Tilson, 503 S.W.2d 921 (Tenn. 1974); State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *11 (Tenn. Crim. App. Mar. 9, 2011); State v. Antonius Harris, No. W2001-02617-CCA-R3-CD, 2002 WL 31654814 (Tenn. Crim. App. Nov. 7, 2002); State v. Khristian Love Spann, No. 1230, 1989 WL 86566, at *7 (Tenn. Crim. App. Aug. 3, 1989); see also Commonwealth v. LeClair, 840 N.E.2d 510 (Mass. 2006) (providing a history of the rule at common law and citing supporting cases from other jurisdictions); 40 C.J.S. Homicide § 114 (2010); 40 Am. Jur. 2d Homicide § 53 (2010).

Here, the Defendant testified that he did not intend to shoot Mr. Rhodes and that he was not aiming at Mr. Rhodes. The Defendant's testimony was that he fired a single shot into a crowd because he was afraid for his life due to the crowd surrounding him, Mr. Knight's having said something to him, and the fact that Mr. Knight was so close he "just thought [he] was gonna get hit by the bat." As such, the Defendant's testimony did not establish that the victim, Mr. Rhodes, specifically caused the alleged provocation or was even the intended target of the Defendant's shot. Accordingly, we conclude that there was nothing in the Defendant's testimony that would be legally sufficient to support a conviction for attempted voluntary manslaughter.

**B. Possession of a firearm**

Possession of a firearm during the commission of a dangerous felony is a lesser-included offense of employment of a firearm during the commission of dangerous felony. State v. Fayne, 451 S.W.3d 362, 370 (Tenn. 2014). However, the Defendant failed to raise this issue in his motion for new trial and did not mention it during the motion for new trial hearing. As such, the Defendant has waived full appellate review of this issue. See Tenn R. App. P. 3(e) (providing "that in all cases tried by a jury, no error presented for review shall be predicated upon error in the . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for new trial"); State v. Spadafina, 952 S.W.2d 444, 451 (Tenn. Crim. App. 1996) (holding that failure to raise a trial court's not having charged a lesser-included offense in a motion for new trial waives the issue on appeal). Therefore, we review this issue solely to determine if plain error review is warranted.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, the Defendant has failed to establish that a substantial right was adversely affected. Page, 184 S.W.3d at 230. Our supreme court has recently held that when, as is the case here, "the proof at trial [is] uncontroverted and overwhelming that the [defendant] employed his gun during" the offense, then no reasonable jury "would have convicted the defendant of the lesser-included offense [of possessing a firearm during the commission of a dangerous felony] instead of the charged offense." State v. Martin, 505 S.W.3d 492, 507 (Tenn. 2016). As such, "the [D]efendant has failed to show that the failure to give the lesser-included offense instruction adversely affected a substantial right." Accordingly, we conclude that plain error review of this issue is not warranted.

## IV. Self-Defense Jury Instructions

The Defendant contends that the trial court committed several errors when instructing the jury on self-defense. The Defendant argues that the trial court erroneously rejected his request to charge "the State's burden to negate self-defense . . . with the other

-15-

matters the State had to prove" and with the elements of each of the listed offenses. The Defendant further argues that the trial court erroneously shifted the burden of proof onto him by rejecting his request to strike the words "[i]f evidence is introduced supporting self-defense" from the self-defense jury instruction. The State responds that the trial court's jury instructions provided a correct and complete charge of the applicable law; therefore, the trial court did not err in rejecting the Defendant's requests for special jury instructions.

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)). Because the propriety of jury instructions is a mixed question of law and fact our review is de novo with no presumption of correctness. State v. Fayne, 451 S.W.3d 362, 373 (Tenn. 2014).

The Defendant requested that the trial court add "the negation of the defense of self-defense" to the jury instruction listing the necessary elements the State needed to prove beyond a reasonable doubt. The Defendant also requested that the phrase "that the [offense] was not done in self-defense" be added as an essential element in the jury instructions for each charged offense and all of the listed lesser-included offenses. The Defendant based this request on Tennessee Code Annotated section 39-11-201(a), which reads as follows:

> No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt:
> (1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense;
> (2) The culpable mental state required;
> (3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense; and
> (4) The offense was committed prior to the return of the formal charge.

The Defendant argued that the jury instruction should mirror the structure of section 39-11-201(a).

The trial court rejected the Defendant's request. Instead, the trial court used the applicable Tennessee Pattern Jury Instructions. See 7 Tenn. Prac. Pattern Jury Instr.—Crim. §§ 2.04, 40.06(b) (21st ed. 2017). While it rejected the Defendant's request to

include the State's burden to negate his claim of self-defense in its general discussion of the State's burden of proof and the elements of the applicable offenses, the trial court did instruct the jury as follows:

> If evidence is introduced supporting self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense.

> If, from all the facts and circumstances, you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

This court has previously addressed these issues. See State v. Tanya Nicole Slimick, No. M2014-00747-CCA-R3-CD, 2015 WL 9244888, at *18-21 (Tenn. Crim. App. Dec. 17, 2015); see also State v. Christopher Michael Ferrell, No. M2015-01011-CCA-R3-CD, 2016 WL 6819784, at *16-19 (Tenn. Crim. App. Nov. 18, 2016) (adopting the reasoning of Slimick and reaching the same conclusion), perm. app. denied (Tenn. Mar. 9, 2017). Trial courts "are not limited to mere recitation of the pattern instructions." Slimick, 2015 WL 9244888, at *20. However,

> [w]hile the requested instruction was not given in conjunction with the other statutory requirements, the jury instructions clearly informed the jury that the State bore the burden of negating self-defense beyond a reasonable doubt and that if the jurors had reasonable doubt that the defendant acted in self-defense, they were to acquit [him].

Id. (internal quotation marks omitted). Additionally, we note "that the jury instruction regarding the State's burden to negate the Defendant's claim of self-defense was given to the jury before it began deliberating." Ferrell, 2016 WL 6819784, at *17. Accordingly, we conclude that the trial court did not err in rejecting the Defendant's request for this special jury instruction.

The Defendant also requested that the prefatory phrase, "[i]f evidence has been introduced supporting self-defense," be removed from the trial court's self-defense instruction. The trial court rejected the Defendant's request and instructed the jury as described above. On appeal, the Defendant argues that the prefatory phrase improperly shifted the burden to "the [D]efendant to 'raise' the defense when instead this was an issue of law for the trial court and not the jury."

A panel of this court has previously concluded "that the prefatory phrase [does] not shift the burden of proof from the State to the [d]efendant." Ferrell, 2016 WL 6819784, at *18. The prefatory phrase does not explicitly state "who was to introduce

the evidence of . . . self-defense." Id. More importantly, "the self-defense jury instruction given here made clear that the State had the burden of disproving the Defendant's claim of self-defense and that the jury should acquit the Defendant if he acted in self-defense or there was reasonable doubt as to whether he acted in self-defense." Id.; cf. Slimick, 2015 WL 9244888, at *16-17 (concluding that use of the prefatory phrase was harmless error when, as here, "there [was] simply no possibility of jury confusion regarding the fact that evidence of self-defense had been introduced and that the jury was required to consider the issue"). Accordingly, we conclude that the trial court did not err in denying the Defendant's request for this special jury instruction.

### V. Cumulative Error

The Defendant contends that he is entitled to a new trial based upon cumulative error. The Defendant argues that the "various errors" raised in his brief are "individually" sufficient to warrant a new trial, but that "in combination they are even more overwhelming." The State responds that the Defendant "is not entitled to relief" based upon cumulative error.

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77. Here, the Defendant has failed to establish that "more than one actual error [was] committed in the trial proceedings." Id. at 77. Accordingly, we conclude that this issue is without merit.

### CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-18-